THE D. M. GOODWILLIE COMPANY, Appellant, *vs.* THE
COMMONWEALTH ELECTRIC COMPANY *et al.* Appellees.

*Opinion filed June 16, 1909—Rehearing denied October 7, 1909.*

1. EASEMENTS—*easements may be created by covenants or by
agreements.* Easements may be created by covenants or agree-
ments as well as by grant, and in construing such instruments the
court may look to the circumstances attending the transaction, to
the situation of the parties, the state of the thing granted and the
object to be attained, in order to ascertain and give effect to the
intention of the parties.

2. SAME—*in case of ambiguity the practical construction by the
parties may be resorted to.* In case of an ambiguity in the mean-
ing of a contract creating an easement the practical construction
placed thereon by the acts of the parties may be resorted to to de-
termine the meaning of the grant.

3. SAME—*when signing petition to vacate street is an abandon-
ment of party's rights.* A lot owner who signs a petition for the
vacation of a street shows his intention that the property may be
used for private purposes, and, in effect, abandons any possible
easement he may have in the use of a switch track in the vacated
portion of such street, and his acts in relation thereto are binding
upon his successors in title.

4. SAME—*when property owners consenting to the vacation of
a street are estopped to demand restoration of original conditions.*
Where property owners in a block consent to the vacation of a por-
tion of a street and extensive improvements are erected upon the
vacated portion in reliance upon such vacation, such property own-
ers and their successors in title are estopped to demand that the
original conditions be restored.

5. SAME—*when easement is appurtenant.* Where the dominant
and servient estates are clearly defined in an easement contract
and the easement is beneficial to the dominant estate the easement
is appurtenant and not in gross, and it is not necessary that the
dominant and servient estates be contiguous or that the right of
way granted shall terminate on the dominant estate.

6. SAME—*easement created by a grantor in favor of lands re-
tained is appurtenant.* An easement created by a grantor in lands
of his grantee in favor of lands retained by the grantor and bene-
ficial thereto is appurtenant to the lands retained and is binding
upon subsequent purchasers of the grantee's land.

7. SAME—*the word "heirs" need not be used to make easement
a perpetual one.* An agreement between grantor and grantee that

the grantee will construct a switch track which "may be forever after used" by the owners of other lots fronting on certain streets, creates a perpetual easement in the use of such track, although it does not use the word "heirs" or any other words which would convey a fee at common law.

8. SAME—*equity may enforce an easement contract in favor of person not a party to the agreement.* A court of equity may enforce an agreement creating an easement in favor of a person not a party to the easement contract, where the contract was made for his benefit and was based upon valuable consideration.

9. SAME—*when an easement in favor of lots includes territory embraced in vacated street.* Where a plat is not a statutory one and a street shown thereon has not been accepted by the public, a purchaser of an abutting lot takes title to the center of the street, and an easement created in favor of the lot while such condition exists attaches to the portion of the street belonging to the lot; and while subsequent public acceptance of the street charges the public easement upon the title of the property owner, yet when the street is thereafter regularly vacated the property owner is restored to a full enjoyment of his rights.

10. SAME—*when lots have no rights under easement contract.* Although a contract creating an easement in the use of a switch track may have been intended for the benefit of all the lots in a certain subdivision, no rights can be claimed in favor of the lots whose owners failed to contribute to the cost of constructing and maintaining the track.

11. SAME—*when use of a switch track easement is excessive.* Where the owner of lots having an easement in the use of a switch track constructs an electric plant so that it is partly upon such dominant lots and partly upon non-dominant lots, the switch track can be used only for the benefit of the dominant lots; and if the boilers are located on dominant land, but the turbines, to which the steam is piped and which operate the dynamos for generating electric current, are partly upon non-dominant land, the use of the switch track to convey coal for the boilers and ashes and cinders from the boilers is excessive.

12. PLATS—*plat cannot be partly statutory and partly common law.* A plat is an entirety, and if a part of the owners whose lands are included in the plat fail to comply with the statute requiring acknowledgment of the plat in person, the effect of the entire plat as a statutory dedication is destroyed, even though the owners of the other lands embraced in the plat complied with the statute.

APPEAL from the Superior Court of Cook county; the Hon. FARLIN Q. BALL, Judge, presiding.

This was a petition filed by the appellant September 21, 1903, under the Burnt Records act, (Hurd's Stat. 1908, chap. 116, p. 1728,) to establish its title in fee simple to lot 82 (except the north twenty-five feet thereof) and lots 83 to 86, inclusive, in Greene's South Branch addition to Chicago, Cook county, Illinois, and to enjoin certain of appellees from using a switch track on said lots, the public records relating to which title were destroyed by the great fire in Chicago, October 8 and 9, 1871. The petition was thereafter amended, and after the issues were finally joined on the pleadings the matter was referred to a special master in chancery, and on the report of his findings being made to the trial court a decree was entered therein, from which an appeal has been prosecuted to this court.

No question is raised as to the sufficiency of the pleadings, and as they are quite voluminous no attempt will be made to set them out. The conclusions of the master and the findings of the decree will be better understood after the principal facts in the record are stated.

In 1856 the owners of a tract of land (in which are included the lots now in question) subdivided it under the title "Greene's South Branch addition to Chicago," and caused a plat to be filed for record in the recorder's office of Cook county June 17, 1856. The plat was executed and acknowledged by certain of the owners by their attorneys in fact, and by other of the owners in person, before a justice of the peace in Cook county. William Greene and John F. Hance, who acknowledged the plat in person, were then owners, as equal tenants in common, in fee simple, of 35.64 acres in the central part of the land covered by the plat, and some of the other parties who joined in the plat owned the west 20.24 acres and others the east part of the tract. The exact location of the lines dividing the Greene and Hance portion of the platted land from the other portions thereof is not clearly shown by the evidence, but it is alleged in the petition, admitted by the answers and found by the master's report and decree, that the land owned by

Greene and Hance at the time the plat was made and recorded included said lots 82 to 86, and it seems reasonably certain from the record that the portion owned by Greene and Hance also took in lots 87 to 93, inclusive, and the land south of the last named lot to the river. The portion of said plat of Greene's addition which appears necessary for an understanding of the issues involved is herewith given:

Of the land shown on the foregoing plat, lots 82 to 97, inclusive, and 33 to 39, inclusive, together with strips of land shown on the plat as Fisk street and Lumber street, between Allen's and Mason's canals, are involved in this controversy. At the time of the subdivision this property was a rough slough, with mudholes throughout, and the owners, shortly after making said plat, proceeded to dig the canals as shown, which were afterwards made navigable for heavily laden vessels. The first occupants of the land were Walker & Cutting, who established a brickyard there and filled up a large part of the slough. In 1859 the owners of the property in question, (with the exception of Caleb Allen, who owned lots 94 to 103, inclusive, and probably other property,) in order to pool their interests, facilitate the handling of the property and acquire railroad and water communications, proceeded to organize the Chicago South Branch Dock Company under a special act of the General Assembly. This charter authorized the corporation to improve the lands therein described, (including the property in question,) build canals, construct railroads and otherwise manage and improve the territory. Its capital was $650,-000 and its duration limited to thirty years. Upon its incorporation the several owners of the lots here in question, with the exception of Caleb Allen, conveyed to it their respective holdings and took stock in the corporation in exchange therefor.

February 28, 1865, the dock company, by deed, conveyed in fee to John S. Reed, Asa E. Cutler, John H. and George Witbeck, as tenants in common, the south half of lot 82 and lots 83, 84, 85 and 86 in Greene's addition, and at the same time and as a part of the same transaction, and as a part of the consideration therefor, a contract, hereinafter set out, was signed by the parties to the deed. On February 27, 1867, the dock company conveyed in fee, by warranty deed, to John S. Reed, Asa E. Cutler, John H. and Henry Witbeck, the south twenty-five feet of the north

fifty feet of lot 82. Reed, Cutler, John H. and George Witbeck thereafter conveyed all their interests in said lots 82 to 86, inclusive, to Henry Witbeck. The latter died testate April 12, 1891, while a resident of Cook county, Illinois, where his will was probated, devising to his son, John H. Witbeck, in fee simple, said lots 82 to 86, inclusive. The title to said lots 82 to 86, inclusive, remained in said John H. Witbeck until July 5, 1903, when, by warranty deed, on that date he conveyed them to appellant, subject to the railroad rights in the north twenty-five feet of said lot 82.

These lots, as we have stated, were first occupied by Walker & Cutting as a brickyard, early in 1866. The brickyard was thereafter removed and the lots taken possession of by Reed, Cutler, John H. and George Witbeck, who composed the firm of Cutler, Witbeck & Co., and occupied them until about 1868 as a lumber yard. In the latter year the Henry Witbeck Company succeeded to the business of Cutler, Witbeck & Co., and continued in the lumber business on the premises until May, 1894. In the last named year John H. Witbeck, the then owner, leased the lots to Arthur Gurley & Co., lumber dealers, who occupied them until October, 1901, when they sub-let them to Deacon & Co., lumber dealers, for a term expiring April 30, 1904, and Deacon & Co. continued in possession to that time. Upon the conveyance of said lots by John H. Witbeck to appellant, in 1903, Deacon & Co. attorned to that company until they surrendered possession of the lease of their lots, and the lots have since been in the possession of appellant.

By deed dated October 1, 1865, the dock company, then being the owner of lots 87, 88 and 89 and the north half of lot 90, conveyed the same to Jacob and Henry Beidler. September 21, 1865, the company deeded the south half of lot 90, all of lot 93 and the south half of lot 92 to Jacob and Henry Beidler. September 23, 1865, William Greene, then owner of the north half of lot 92, conveyed the same in fee to Jacob and Henry Beidler. By sundry conveyances

through William Greene, John F. Hance and Jasper Fisk, lot 91 was conveyed on September 21, 1865, to Jacob and Henry Beidler. Thereafter, by conveyances and inheritance, Augustus F. Beidler, son of Jacob Beidler, became the owner in fee of said lots 87 to 93, inclusive, and by deed dated October 25, 1901, conveyed the same in fee to Louis A. Seeberger, who by deed of the same date conveyed said lots to the Commonwealth Electric Company. All of said lots 87 to 93, inclusive, were occupied for the lumber business by various firms from 1865 until the property passed into the possession of the Commonwealth Electric Company, in 1902. The occupancies of the various firms need not be set out in detail.

By sundry conveyances from William Greene, John F. Hance and Henry G. Miller, Jacob Beidler and Henry Beidler obtained title to said lots 36 to 39, inclusive, January 5, 1866, and these lots afterwards became the property of Augustus F. Beidler, and by him were conveyed, through Seeberger, to the Commonwealth Electric Company, October 25, 1901. These lots were occupied by various firms engaged in the lumber business from 1866 to 1902, when they came into the possession of the Commonwealth Electric Company. By sundry conveyances through William Greene, Richard J. Arnold and Amos Greene, lots 33, 34 and 35 were conveyed to Jacob Beidler by deed dated August 15, 1881, and thereafter by Augustus F. Beidler, through Seeberger, to the Commonwealth Electric Company October 25, 1901. These lots also were occupied by various firms in the lumber business from 1867 or 1868 down to 1901, when they were acquired by the Commonwealth Electric Company.

At the time Greene's subdivision was made, in 1856, Caleb Allen appears to have been the owner of lots 94 to 103 and 104 and 105. Some time in 1856, the exact date not being clearly shown in the record, Allen conveyed these last two lots to the South Branch Dock Company, which

corporation in 1868 re-conveyed them to Allen.   By deed
dated June 9, 1902, James Nowell, trustee under the will
of Caleb Allen, conveyed lots 94 to 97 to Louis A. See-
berger, and the latter, by deed dated June 9, 1902, conveyed
the same to the Commonwealth Electric Company.   Janu-
ary 30, 1904, James Nowell, as such trustee, conveyed lots
98 to 105, inclusive, to Louis A. Seeberger, and the latter
on the same date conveyed them to the Commonwealth
Electric Company.   Most, if not all, of these last named
lots were occupied by the various corporations in the lum-
ber business from 1868 until they were taken possession of
by the Commonwealth Electric Company.

In 1868 all of the land south of Twenty-second street,
in the vicinity of the land in question, was used for lum-
ber yards, and it is now known as the lumber district.
Throughout this district switch tracks run from the main
railroad lines through side streets, and curved switches,
similar to the one involved in this case, are provided for
in deeds of property in the district similarly situated with
reference to the railroad.   March 15, 1864, an agreement in
writing was entered into between the Chicago South Branch
Dock Company and the Chicago, Burlington and Quincy
Railroad Company by which the dock company conveyed to
the railroad company certain lands, and the right to use
perpetually the strip of land twenty-five feet in width from
the north side of Greene's South Branch addition to Chi-
cago, within the lands of the dock company, for railroad
purposes.   The railroad company, on its part, agreed to put
in and maintain at suitable points on said tract so conveyed,
switches and frogs, to connect with each railroad track
which might thereafter be put down in each of the streets
running north and south through said South Branch addi-
tion, and agreed that it would permit the dock company, or
other owners of property in said addition, to connect with
said railroad, subject to the condition that all tracks to be
put down in said streets should be constructed and main-

241 — 4

tained at the expense of the dock company or the persons constructing the same. About 1866 the Burlington Railroad Company began the construction of a track along the north twenty-five feet of the lands in Greene's South Branch addition. A track was likewise built running east and west on Twenty-second street. February 28, 1865, the contract heretofore referred to was entered into between the Chicago South Branch Dock Company of the first part, and John S. Reed, Asa E. Cutler, John H. Witbeck and George Witbeck of the second part. This agreement reads as follows:

"Agreement made this twenty-eighth day of February, A. D. 1865, between the Chicago South Branch Dock Company, party of the first part, and John S. Reed, Asa E. Cutler, John H. Witbeck and George Witbeck, party of the second part:

"*Witnesseth:* Whereas the party of the first part has this day sold and conveyed to the party of the second part the following described lots, pieces and parcels of land situate in the city of Chicago, county of Cook and State of Illinois, to-wit: The south half of lot 82 and the whole of lots 83, 84, 85 and 86 in Greene's South Branch addition to Chicago:

"Now, therefore, in consideration thereof and of the agreement hereinafter made by the said party of the first part, the said party of the second part do covenant and agree to and with the party of the first part that they will, within sixty days after they shall take possession of the lots so .conveyed to them, as aforesaid, build a railroad track from the track now laid down by the Chicago, Burlington and Quincy Railroad Company immediately south of the south line of Twenty-second street, on a curve not greater than six hundred feet radius, to the center of Fisk street, in Greene's South Branch addition, and thence down the center of Fisk street as far as the south line of lot 86 extended to the center of Fisk street, so as that the same may be extended south of Fisk street, and that said track, when so built, may be forever after used, in common with the said party of the second part, by any and all of the owners of other lots fronting on Lumber street, between Mason's canal and Allen's canal, and of lots fronting on Fisk street, in said addition: *Provided, however,* that the owner of each lot using said railroad track shall, before he shall be entitled to use the same, pay to said party of the second part such proportion of the cost of constructing said railroad track from the Chicago, Burlington and Quincy railroad to the north line of the south fifty feet of lot 82 as the width of such lot shall bear to the combined width of

all the lots using said railroad, and shall thereafter pay the same proportion of the expense of keeping in repair said railroad track from the Chicago, Burlington and Quincy railroad as far as the same may be extended; and the said party of the first part on its part doth covenant and agree that the said party of the second part may, upon the faithful performance and observance by them of their agreement as herein contained, lay a second railroad track for the accommodation of said lots so conveyed to them, as aforesaid, over the south twenty-five feet of the north fifty feet of lot 82, and that they may use and operate said railroad track upon and over said south twenty-five feet so long as they shall well and faithfully observe the stipulations herein contained and on their part to be performed.

"In testimony whereof the said party of the first part has signed these presents by its president and affixed its seal hereto, and said party of the second part have signed these presents and affixed their seals hereto, the day and year first above written.

CHICAGO SOUTH BRANCH DOCK CO.,

By R. E. Mason, *President.*

|                    |                   |          |
|--------------------|-------------------|----------|
| [Corporate         | JOHN S. REED,     | (Seal)   |
| Seal.]             | ASA E. CUTLER,    | (Seal)   |
|                    | JOHN H. WITBECK,  | (Seal)   |
|                    | GEORGE WITBECK.   | (Seal).  |

"It is understood that Cutler, Witbeck & Co. are not bound to allow parties owning lots 101, 102, 103 to use the track which they construct from the C., B. and Q. R. R. track south of South street to the south line of lot No. 86 unless they pay their proportion of the cost of the same.

R. B. MASON, *Pres. C. S. B. D. Co.*

[Corporate Seal.]  Attest: A. J. KNISELY, *Sec.*

This instrument was duly acknowledged and recorded. The records showing this agreement having been destroyed by the great fire in 1871, the parties in 1874 restored it and re-filed the copy, with the following statement and agreement signed by the officers of the Chicago South Branch Dock Company and the then owners of lots 82 to 86, inclusive. This agreement, filed as a part of the original agreement, reads as follows:

"Whereas, Henry Witbeck has become seized of the premises above described as having been sold and conveyed by the Chicago South Branch Dock Company to John S. Reed, Asa E. Cutler, John H. Witbeck and George Witbeck, the said Henry Witbeck having by conveyances of the same succeeded to the estate of said

grantees, who were known as Cutler, Witbeck & Co.; and whereas, the original of the foregoing articles of agreement, dated February 28, 1865, and of the supplemental provision aforesaid thereto added, was destroyed in the Chicago fire of October 8 and 9, 1871:

"Now, it is understood and agreed between the said Chicago South Branch Dock Company of one part and said Henry Witbeck of the other part, that the foregoing is a substantial copy of the original papers and is to be taken and treated accordingly, and to be binding on the parties and their legal representatives in like manner as the original of each of said papers was binding.

"In witness whereof the Chicago South Branch Dock Company causes this writing to be signed by its president and secretary and the corporate seal of the company to be hereto affixed, and this writing is signed and sealed by said Henry Witbeck.

CHICAGO SOUTH BRANCH DOCK CO.,

[Corporate    By R. B. Mason, *Pres.*, and E. G. Mason, *Sec.*,
Seal.]        H. WITBECK,
              J. H. WITBECK.

Attest: E. G. MASON, *Secretary."*

This supplemental agreement, attached to the original, was acknowledged by the officers of the company and by H. Witbeck and John H. Witbeck, then owners of said lots.

In 1866, under the privileges conferred by the contract between the dock company and the railroad company above referred to and in accordance with its terms, a railroad switch track was constructed, beginning at the Burlington track on the north twenty-five feet of Greene's South Branch addition, just east of lot 82, and running in a curve south-westerly across lots 82, 83 and 84 and the north-west corner of lot 85, to Fisk street. The approximate location of the track is shown by the following plat:

The curved track, as shown on this plat, has remained in its original position up to this time. The proof is not clear as to how far south in Fisk street this track was built

at that time, but it may be assumed from this record that it was extended in accordance with the terms of the agreement by the then owners of lots 82 to 86, as far south, at or near the center of Fisk street, as the south line of said lot 86. At any rate, the record shows that within a year after the construction of the curved track it was extended directly south, approximately along the center line of Fisk street, across Lumber street, to about sixty feet north of the river. Another extension branched from the east side of the main track last noted in Fisk street about opposite lot 86 and ran south in Fisk street to about opposite lot 89. From the westerly or main track in Fisk street, near lot 93, two branches ran off to the south-east for the use of occupants of that part of the land in question, and a third spur track ran from said main extension south-east to lot 36. These extensions remained until the South Branch Lumber Company came into possession of them, and then the two switch tracks which branched from the main track near lot 93 were discontinued, and later there was constructed a track from the main switch between lots 88 and 90, which ran south parallel with the main track to a point approximately sixty feet north of the river. This situation continued until 1898, when the Lord & Bushnell Company located on some of the ground now owned by the Commonwealth Electric Company. The Lord & Bushnell Company made some slight changes in the tracks at the southerly end, but preserved the same general situation until the Commonwealth Electric Company came into the possession of its lots as above set forth in 1902, and made certain changes in these tracks and built others. The tracks as changed and constructed, together with the buildings erected by the said Commonwealth Electric Company, are shown with approximate accuracy by the following plat:

At or shortly after the construction of the curved track in question a spur was built which branched from the north side of the curved track near the entrance of the latter into lot 82 and proceeded west to a point just west of lot 82, as shown in plat 3 above.   About 1875 a switch track ran

south-easterly across lot 105, and thence curved toward the south and ran west of and parallel with Fisk street to a point not far from the river. The track was used by the occupants of lots west of Fisk street, and continued in operation for the benefit of lots west of Fisk street and south of lot 98 until the Commonwealth Company came into possession of the property here in question. This track is now owned and controlled by the Commonwealth Company.

Prior to the removal of the brickyards of Walker & Cutting the land within the lines of Fisk and Lumber streets was used as a part of the adjoining property, with no indication of the street lines. After the establishment of lumber yards in this district Fisk street to Lumber street was left open in part, but the adjoining occupants, to a greater or less extent, piled lumber in the street, leaving only room enough for teams to haul lumber back and forth. The street, however, was not graded or thrown up. The use of Fisk street for teaming purposes continued until the Commonwealth Electric Company took possession of its lots, in 1902. The use of Fisk street for piling lumber ceased in 1875, when the city authorities forbade the practice of obstructing the street. Lumber street was never thrown up or used as a street, and until the Commonwealth Company came, in 1902, was used by the adjoining occupants for piling lumber. In May, 1902, the city of Chicago, by ordinance, vacated the part of Lumber street between Mason's canal and Allen's canal and the part of Fisk street between Lumber street and the north line of lot 97 extended. Such vacations were made upon petitions signed by adjacent property owners, one of which was signed by John H. Witbeck, who was then the owner of lots 82 to 86, inclusive.

In 1902 the Commonwealth Electric Company constructed a fence, beginning on the north line of lot 97 at its intersection with Allen's canal, thence running east to the east line of Fisk street, thence north three hundred feet to the north line of lot 87, and thence east to Mason's canal.

It was a tight board fence, five feet or more in height. Within the lines of what was formerly Fisk street there were two gates, fastened with movable braces, providing openings for the two westerly railroad tracks on Fisk street. In constructing said fence said Commonwealth Company left an opening in the portion of the fence running north and south, near the north line of lot 87, for the switch track. The fence is now substantially in the condition described, with a barbed wire running along its top. The gate for the center track is kept closed, except when railroad cars or employees pass through.

At the present time lot 82, except the north twenty-five feet thereof, and lots 83 to 86, are occupied by petitioner, which conducts thereon its business of box manufacturing, and the present improvements consist of a brick office building toward the east end of lot 82, and a frame shed north of the switches on lot 82 but projecting slightly into Fisk street. The location is shown on plat 3, heretofore given.

The Commonwealth Electric Company occupies lots 33 to 39, inclusive, and lots 87 to 97, inclusive, and that part of Lumber street between Mason's and Allen's canals, and that part of Fisk street between Lumber street and the north line of lot 97 extended. The Commonwealth Electric Company is engaged in the business of manufacturing and selling electric current. The buildings placed on said lands by the said company and now occupied by it are as follows: The main building, which is of brick, two hundred and forty feet in its east to west measurement and two hundred and thirty feet from north to south. Its west line is nearly coincident with the west line of Fisk street vacated, and the building extends thence easterly, occupying a considerable portion of lots 92 and 91 and a small part of lot 90. Its location is shown on plat 3. Switch tracks enter the building as set forth thereon. Its north line is sixty-six feet south of the north line of lot 97 extended. The construction of the building was begun in June, 1902, and completed

before May 1, 1904. The building contains machinery for generating electricity. It is about eighty feet in height, with large smoke-stacks. The machinery is massive, and a considerable portion of it is located within the lines of Fisk street. Other improvements on the property of the Commonwealth Company consist of a small gate-keeper's office, (a frame structure, one story high,) at the north-west corner of lot 88; a substantial brick building, approximately one hundred and fifty feet in length, occupying the eastern portion of lots 95 and 96; a long frame shed occupying a portion of lot 36 and Lumber street vacated, and a small frame structure on the north-west corner of lot 93,—all of which are shown on plat 3 above.

The exact character and position of the machinery is set forth in a stipulation filed by the parties to this litigation, substantially as follows: The actual manufacturing of electricity is carried on entirely within the large brick building. There is a brick wall extending north and south from the north to the south end of this building to its full height, the east face of which is six feet west of the east line of the vacated portion of Fisk street. The portions of this building east and west of the east face of the brick wall constitute one entire building and together constitute a part of the plant of the Commonwealth Electric Company, which is devoted exclusively to the business of manufacturing and distributing electricity. This plant consists of steam boilers for making steam used in the generation of electrical current, and steam turbines and generators for generating electricity by the use of the steam made in the boilers, and of other necessary equipment. All the steam boilers in this plant are located in that part of this building which is east of said brick wall, and the west end of each of these boilers is located 8.94 feet east of the west face of the brick wall. There are in that part of the building west of the brick wall ten steam turbines and electrical generators, arranged in a line from the north to the south end of that

part of the building which is west of the brick wall, (which room is called the turbine room,) each of which turbines and generators is fixed upon a vertical shaft and constitutes a body of machinery which is of a cylindrical shape, about twenty-five feet high and sixteen feet in diameter at the base and narrowing to about twelve feet in diameter at the top. These turbines and generators are so located that the east half of each one of them is upon the east side and the west half on the west side of a line drawn through the center of Fisk street vacated. Running from the part of the building which is east of the brick wall are ten metal pipes, fourteen inches inside diameter, which run from the steam boilers through the brick wall into that part of the building west of the wall and there connect with the steam turbines, each of the pipes connecting the boiler to which it is attached with the corresponding turbine, said pipes being used for the purpose of conveying steam from the boilers to the turbines, for the purpose of operating the turbines in the making of electricity in said plant. The portion of the building west of the wall is all one room, and along the east side of it, about fifteen feet from the ground floor, is a balcony five feet in width, extending along the entire east side of the turbine room, and opening upon this balcony are six doors in the brick wall at substantially equal intervals from the north to the south, which doors lead onto the floor of the second story of that part of the large brick building which is east of the wall, and immediately below said six doors are six large double doors, which lead from the ground floor on the turbine room into that part of the building east of the brick wall, or the boiler room.

The Commonwealth Company has used, and is using, the curved track across lots 82 to 85 in connection with the switch track constructed by it in 1902, branching from the curved track in Fisk street towards the east, opposite lot 85, and thence, with its branches, entering lots 87 to 90, as shown on plat 3, almost exclusively for the purpose of car-

rying coal onto the lots owned by it lying east of Fisk street, into the part of the building east of the brick wall and wherein its boilers are located, to be used, and actually used by it, for producing steam in said boilers and for the purpose of carrying away the cinders and ashes remaining after the combustion of the coal. The company, in operating its plant, uses large quantities of coal in the furnaces under these steam boilers. The steam made in the steam boilers from said coal is conducted from the boilers through said metal pipes to the steam turbines in the turbine room and there used in the turbines for the manufacture of electricity. These conditions, with reference to the arrangement and operation of the plant, existed at the filing of the original petition, with the exception that at that time there were only four steam turbines and electric generators, with their connecting boilers, in the plant, while now there are ten turbines and generators, with their connecting boilers, therein.

All the switching done over the curved track has been done by the Burlington railroad, with its locomotives. The east and west switch track has been used exclusively by the owners of lots 82 to 86, and the owners and occupants of said lots have never used the tracks south of the south line of lot 86, except that during the occupancy by the Henry Witbeck Company of lots south of lot 86 that company used a portion of the tracks opposite the lots it occupied, and very rarely at other periods lines of cars standing for the most part opposite lots 82 to 86 were pushed slightly south of the latter lot. From the first use of the property in question to approximately the year 1885 the curved track was used by the occupants of the several lumber yards for shipping their lumber out over the curved track to the Burlington road. During that period, and continuously since that time, substantially all receipts of lumber by all of the occupants of yards on the property in question were by water, and cars coming in by the curved track were sent in empty,

to be filled at the yards. During the period from 1868 to approximately 1885 the switching of these cars over the curved track was done partly in the day and partly at night, but after the year 1885 a change in the service was made, and from that time to the purchase of the property by the Commonwealth Company switching over the curved track was only during the night time, (except on Sundays, when it was done in the daytime,) and on rare occasions at other times during the day, seemingly by the special request of the occupants of the yards south of lot 85, and then by the consent of the owners of lots 82 to 86. At all times the cars were placed in numbers and at places to suit the convenience of the occupants of the different yards, and the curved track apparently was used by the various occupants of these yards for the cars to stand on while they were being loaded and unloaded with lumber.

The use of the curved track by the Commonwealth Electric Company has been substantially as follows: During the time of the construction of its buildings the materials were delivered by cars over it. This use occurred during the day as well as during the night, and continued for the period of a year. The machinery for the buildings was likewise delivered in the same way. No proof of objections on the part of the owners or occupants of lots 82 to 86 was made. During the last named period Deacon & Co. were in possession of lots 82 to 86, and upon one occasion a request was made of the Commonwealth Electric Company by that firm that the cars running to and from the Commonwealth plant or standing upon the tracks be so handled or placed as to enable them to load their cars without interruption. After the occupancy of the appellant company a request was made by that company of the Burlington road to place the Goodwillie cars upon the track south of their occupation, so that when the Commonwealth Company switched its cars through, the Goodwillie cars would not have to be removed entirely from the track in question. This request

was not granted. Deacon & Co. used the curved track within lots 82 to 85 during the daytime to load and unload lumber. After the completion of its buildings, as heretofore set out, the Commonwealth Company used, and is using, as shown by the stipulation between the parties heretofore set out, the curved track.

The special master made an exhaustive report to the superior court, setting forth the facts as stated above and his conclusions of law thereon, and the court, after a hearing, entered a decree finding, among other things, that the deeds, conveyances and other instruments in writing in the chain of title of said D. M. Goodwillie Company to said lot 82 (except the north twenty-five feet thereof) and said lots 83 to 86, in Greene's South Branch addition to Chicago, and said records in the recorder's office of Cook county of said deeds, conveyances and other instruments of writing which were recorded, as theretofore set out in the decree, were destroyed by fire, as therein stated, and that they be established and restored, and that title in fee simple of said petitioner in and to the said premises be and is established and confirmed, subject only to the easements hereinafter expressly decreed to be and exist thereon, or any portions thereof; that the copy of said easement agreement between said dock company and said Reed, Cutler and the Witbecks, dated February 28, 1865, and recorded in the office of the recorder of deeds of Cook county, as hereinabove set out, is a true copy of the original agreement which was recorded in the recorder's office on December 30, 1865, and that the terms and provisions of said agreement, as the same are above set forth, are binding upon the parties to this cause and upon all parties claiming through or under them; that the defendant the Commonwealth Electric Company, its successors and assigns, as owners of lots 33 to 39 and 87 to 93, inclusive, including the half of vacated Fisk street and of vacated Lumber street lying adjacent to said lots, all in Greene's South Branch addition to Chicago, have

the right to use, in perpetuity, the said curved switch track extending from the railroad track of the Chicago, Burlington and Quincy Railroad Company on the north twenty-five feet of Greene's South Branch addition and down the center of Fisk street to the south line of lot 86 extended, as said curved switch track is now located and laid out, as shown on said plats, in common with said Goodwillie Company, as the owner of said lots 82 to 86, inclusive, its successors and assigns, in accordance with the terms and conditions of said easement agreement; that the petitioner and said Commonwealth Company, and their respective successors and assigns, have the right to use said switch track in common, for the purpose of transferring railroad cars thereon, at all times, back and forth between said track of the Burlington Railroad Company on the north twenty-five feet of Greene's South Branch addition and said lots in this clause described, owned by the said Goodwillie Company and said Commonwealth Company, respectively, for the use and benefit of said lots, respectively; that said Goodwillie Company, subject only to the easement herein decreed in favor of said Commonwealth Company, has the right to use the ground covered by said curved switch track and said track upon its premises for all lawful purposes not inconsistent with the rights of said Commonwealth Company, its successors and assigns, as herein set forth; that the right of the Commonwealth Company, its successors and assigns, to use said curved switch track, as aforesaid, constitutes a perpetual easement in said lots 82, (except the north twenty-five feet thereof,) 83, 84 and 85 in Greene's South Branch addition, appurtenant to said lots 33 to 39 and lots 87 to 93, inclusive, in Greene's South Branch addition, including the half of vacated Fisk street and vacated Lumber street lying adjacent to said lots; that said easement is not appurtenant to any of lots 94 to 97 in Greene's South Branch addition, or to the half of vacated Fisk street or of vacated Lumber street lying adjacent to said lots 94 to 97, or any of them,

and is not appurtenant to lots 98 to 105, or to any part thereof; that the use of the said curved switch track by the Commonwealth Company in connection with the switch track constructed by it in 1902, branching toward the east, opposite lot 85, for the purpose of hauling coal, cinders and ashes thereover, as hereinbefore set forth, is within the rights of said company, and that said company, its successors and assigns, have the right to continue such use of said curved switch track; that by said easement agreement of February 28, 1865, neither said Reed, Cutler, John H. Witbeck nor George Witbeck, nor any of them, nor any persons holding said lots 82 to 86 in Greene's South Branch addition under them, acquired any right to the use of any part of the extension of said curved switch track in Fisk street south of the south line of said lot 86 extended, and that said Commonwealth Company, by the construction and maintenance of the fence across Fisk street, has not excluded the petitioner from the exercise of any rights acquired by petitioner under said agreement; that the Commonwealth Company, its successors and assigns, as owners of the lands to which the easement in said curved switch track is appurtenant, have the right forever to maintain said curved · switch track in its present location, as hereinbefore described, and that the cost of maintaining the same shall be borne by the parties using the same in accordance with the provisions of the agreement dated February 28, 1865; that the Commonwealth Company, its successors and assigns, are not entitled to maintain the existing connection between said curved switch track and the track constructed by said company in 1902, and branching towards the west from the track in Fisk street opposite the dividing line between said lots 88 and 89, entering said lot 97 and thence running south parallel with Fisk street (vacated) into lot 35, (this switch track is shown on said plat 3,) or to connect with the said curved switch track any track onto lots 94 to 97, aforesaid, or any of them.

The findings of the decree followed the recommenda-
tions of the master, except in one respect.  The master re-
ported that the cost of construction of the curved switch
track was paid in the first instance by John S. Reed, Asa E.
Cutler, John H. and George Witbeck, or the firm of Cut-
ler, Witbeck & Co., representing the same interests, and that
subsequent to such payment, to-wit, on August 19, 1865,
they sent a bill to Jacob and Henry Beidler, under the name
of Beidler & Bro., for $300.15, being eleven-fifteenths of
the cost for 237 feet of said switch track, and that said bill
was paid by Beidler & Bro. and that the cost of the remain-
der of the track was borne in like proportion; that the first
cost of extension of the switch track south of Fisk street,
including the first branches leading therefrom, as above set
forth, was paid by Jacob and Henry Beidler, owners of the
property lying south of the south line of lot 86; that the
cost of maintaining the tracks on Fisk street south of the
south line of lot 86, and of altering, repairing and main-
taining all the branches south of said line, has always been
paid by the owners of the property lying south of said line;
that the cost of maintaining the curved switch track from
Twenty-second street to the south line of lot 86 was paid
at first in the above proportion of four-fifteenths thereof
by the owners of lots 82, except the north twenty-five feet
thereof, and of lots 83 to 86, inclusive, and eleven-fifteenths
thereof by the owners of property south of lot 86; that an
expenditure of $66 for the repair of said switch track in the
latter part of 1867 was paid in the above proportion; that
subsequently the proportions were changed according to the
relation of the numbers of lots south of lot 86 using the
curved switch track, to the five lots 82 to 86; that in 1898
bills aggregating a considerable sum were paid by the own-
ers in the proportion of four-nineteenths by the owners of
lots 83 to 86 and fifteen-nineteenths by the owners of lots
south of lot 86; that in 1903 certain repairs were made to
the curved track at a cost of $218.08, which amount was

241 — 5

paid by the Commonwealth Company, without contribution from the owners of lots 82 to 86; that the cost of maintenance of the switch track running east and west on lot 82, terminating at Fisk street, has always been paid in full by the owners of lots 82 to 86.

Appellant filed an objection to a part of the above statement, claiming that the evidence showed that the original cost of construction of the curved track south of the north line of the south half of lot 82 to a point in the center of Fisk street, as far as the south line of lot 86 extended to the center of Fisk street, was borne solely by John S. Reed, Asa E. Cutler, John H. and George Witbeck, and that no part of the original cost of construction of this part of said switch track was borne by Jacob Beidler or Henry Beidler, or either of them. This objection was sustained by the court. In all other respects the conclusions of the master and the findings of the decree substantially coincide.

The Chicago Title and Trust Company, as executor of the will of John H. Witbeck, deceased, has filed a brief herein, in which the same position is taken on all legal questions raised as that taken by the appellant company.

JAMES E. MUNROE, and MARTIN M. GRIDLEY, for appellant:

Agreements imposing burdens on one estate for the benefit of another are to be strictly construed against the grantee, so that nothing will pass except what is clearly granted. *Railway Co.* v. *Railway Co.* 58 Minn. 128; *Eckhart* v. *Irons,* 128 Ill. 568; *Hutchinson* v. *Ulrich,* 145 id. 337; *Ewertsen* v. *Gerstenberg,* 186 id. 344; *Hays* v. *St. Paul Church,* 196 id. 633; *Downen* v. *Rayburn,* 214 id. 342.

The rule that restrictions on the use of property held in fee are not favored, and that in construing such restrictions all doubts are resolved in favor of the free use of property for all lawful purposes in the hands of the owner of the fee,—in favor of natural rights and against restric-

tions thereon,—applies equally whether the restrictions are in the nature of reservations to the grantor or are direct grants to the grantee, or are purely easement or restrictive agreements not contained in or accompanying a conveyance of the fee. *Clark* v. *James,* 87 Hun, 215; *White* v. *Collins Con. Co.* 82 App. Div. 1; *Sonn* v. *Heilberg,* 38 id. 515; *Deeves* v. *Constable,* 87 id. 352; *Lewis* v. *Ely,* 100 id. 252; *Hubbell* v. *Warren,* 8 Allen, 173.

No person not a party to the easement contract in question could take a grant of an easement under it. The easement contract is a deed *inter partes. Murphy* v. *Lee,* 144 Mass. 371; Sheppard's Touchstone by Atherly, 237; *Moulton* v. *Faught,* 41 Me. 298; *Stockwell* v. *Couillard,* 129 Mass. 231.

A reservation in favor of a grantor in a deed operates as a grant back to the grantor from the grantee. *Goold* v. *Coal Co.* 2 DeG., J. & S. 600; *Finley* v. *Simpson,* 2 Zabr. 311; *Cooper* v. *Louanstein,* 10 Stew. Eq. 285.

A reservation in a conveyance of land in favor of a stranger to the conveyance is void, both at law and in equity. *Murphy* v. *Lee,* 144 Mass. 371; *Tibbetts* v. *Tibbetts,* 66 N. H. 360; *Hornbeck* v. *Westbrook,* 9 Johns. 73; *Bridger* v. *Pierson,* 45 N. Y. 601; Tiedeman on Real Prop. sec. 843, p. 850; Jones on Easements, sec. 101; 1 Jones on Real Prop. sec. 528.

A deed must take effect upon its delivery or not at all, and only such grantees can take under it, except by way of remainder, as were in existence and ascertained when it was delivered. Delivery includes both parting with the deed by the grantor and acceptance of it by the grantee. *Fash* v. *Blake,* 44 Ill. 302; *Kingsbury* v. *Burnside,* 58 id. 310; *Hulick* v. *Scovil,* 4 Gilm. 159; 135 Ill. 79.

When the easement contract was delivered neither of the Beidlers owned any lot fronting on Fisk or Lumber street, and neither of them acquired title to any such lot until long after the easement contract was delivered, its de-

livery presumably being at the time of its date, and there being nothing to repel the presumption. There is no allegation, no claim, no proof nor finding, that anyone who owned land on Fisk or Lumber street when the easement contract was delivered (other than the dock company) ever accepted the easement contract or even knew of it. The Beidlers, therefore, did not answer the description of owners of lots fronting on Fisk street and Lumber street when the contract was delivered. As an immediate estate cannot be granted to a person not *in esse* and ascertained at the time of the delivery of the deed, it follows that the Beidlers could take nothing under the easement contract as the result of its operation. *Faloon* v. *Simshauser,* 130 Ill. 649; *Morris* v. *Caudle,* 178 id. 9; *Miller* v. *McAlister,* 197 id. 72.

The duty of repairing a way appurtenant to a dominant estate is imposed by the law upon the owners of the dominant estate, upon the theory that those who have the benefits should bear the burdens of the easement. Jones on Easements, sec. 821.

The facts that the owners of the Witbeck lands have never paid anything for the repair of the track south of the south line of lot 86, and that, except during certain considerable periods, the occupants of these lands have not used any of the track south of lot 86, cannot be given the effect of destroying the plain meaning of the contract. Mere nonuser of the extension during intervals of time, no matter how long continued, is of no weight, unless there is a showing of a necessity to exercise the right of user, if it existed, accompanied with proof of a denial of the right to use and acquiescence in the denial. *Tinker* v. *Forbes,* 136 Ill. 221.

The acts of parties under a contract tending to show a practical construction of it are unimportant where the contract is plain and unambiguous, and such acts cannot prevail against the evident meaning of the contract. *Hill* v. *Priestly,* 52 N. Y. 635; *Newport Lodge* v. *Newport,* 138 Ind. 141; *Hutchins* v. *Dickson,* 11 Md. 29.

A street is a public highway, and the term excludes all idea that it is a private way. 27 Am. & Eng. Ency. of Law, (2d ed.) 102.

By a reference in an agreement between parties to a street as bounding land which is the subject matter of the agreement, a covenant is implied that the street exists and shall perpetually exist as an open highway, and an estoppel is raised against using the ground embraced within the street lines for purposes inconsistent with a highway. *Holloway* v. *Southmayd*, 139 N. Y. 390; *Zearing* v. *Raber*, 74 Ill. 409; *Earll* v. *Chicago*, 136 id. 278.

If the recognition in the easement agreement of Fisk and Lumber streets as public highways implied a covenant that they were such and should forever remain such, and estopped the parties from asserting to the contrary, it is impossible to reasonably claim that the dominant estate overlapped the lot lines and extended to the street centers. It makes no difference in the application of this rule that the plat is a common law plat or that the street has not been accepted by the public, since the question involved is simply one of private right. *Earll* v. *Chicago*, 136 Ill. 278; *Zearing* v. *Raber*, 74 id. 409.

Private easements in a street are independent of the public easements, and are in their nature indestructible by acts of the public authorities. *Holloway* v. *Southmayd*, 139 N. Y. 390.

The right conferred by a prescriptive user is confined, as to its extent, manner, character and location, to the user maintained during the entire period of prescription and can not exceed or outrun such prior user, and an alteration in the substance of the dominant estate will put an end to the prescriptive right. *Luttrel's case*, 4 Coke, 86; *Postlewaite* v. *Payne*, 8 Ind. 104; *Bank* v. *Reighard*, 204 Pa. 391; *Atwood* v. *Bodfish*, 11 Gray, 150; *Milner's S. Co.* v. *Railway Co.* 75 L. J. Ch. Div. 807; *New W. Corp.* v. *Stovell*, 54 id. 113; *Wimpledon* v. *Dixon*, L. R. 1 Ch. Div. 362; *Wil-*

*liams* v. *James,* L. R. 2 C. P. 577; *Parks* v. *Bishop,* 120 Mass. 340; Jones on Easements, secs. 201, 291, 293, 826; *Ballard* v. *Dyson,* 1 Taunt. 279.

The owner of the dominant estate, whose easement is acquired by prescription, cannot change the use to a different use in substance, against the consent of the owner of the servient estate, even if the new use is less burdensome than the old. *Bank* v. *Reighard,* 204 Pa. 391; Jones on Easements, sec. 821.

Whether an easement be created by express grant or by prescription the use cannot be changed to a different one, even if the new use be beneficial to the servient tenement. *Kavanaugh* v. *Traction Co.* 127 Mo. App. 266; *Allen* v. *Water Co.* 92 Cal. 388.

WILSON, MOORE & McILVAINE, (ISHAM, LINCOLN & BEALE, of counsel,) for appellee the Commonwealth Electric Company:

It is well settled that easements may be created by covenant or agreement as well as by grant. Jones on Easements, secs. 104-106.

Agreements creating easements are construed as any other agreement is construed, so as to carry out the plain intent of the parties. *Field* v. *Leiter,* 118 Ill. 17; *Barber* v. *Allen,* 212 id. 121.

In the construction of agreements creating easements, the grant, in case of doubt, must be taken most strongly against the grantor. *Williams* v. *James,* 36 L. J. C. P. 256; *Dunn* v. *English,* 25 N. J. L. 126; 14 Cyc. 1201.

In cases of ambiguity the practical interpretation of the grant by the acts of the parties is resorted to to determine the meaning of the grant. Jones on Easements, sec. 389; *Winston* v. *Johnson,* 42 Minn. 498; *Hopper* v. *Barnes,* 113 Cal. 636; *Walker* v. *Railroad Co.* 215 Ill. 610.

Contracts made for the benefit of third parties may be enforced by the parties for whose benefit they were made.

*Dean* v. *Walker,* 107 Ill. 240; *Webster* v. *Fleming,* 178 id. 140.

Courts of equity will enforce agreements creating easements and restrictions on lands when the intention of the parties is clear, regardless of any privity of estate or of contract among the parties. *Parker* v. *Nightingale,* 6 Allen, 341; *Hubbell* v. *Warren,* 8 id. 173; *Whitney* v. *Railway Co.* 12 Gray, 359.

An easement or servitude may be created in favor of a stranger to a contract, and such easement or restriction will be enforced in his favor by a court of equity. *Hays* v. *St. Paul Church,* 196 Ill. 633; 2 Washburn on Real Prop. (4th ed.) 303; Washburn on Easements, (3d ed.) *63; *Gibert* v. *Peteller,* 38 Barb. 488; 87 Minn. 91.

Long continued non-user, accompanied by acts showing an intention to abandon the easement, constitutes an abandonment. Jones on Easements, 852, 863.

If the owner of an easement agrees or consents that a building may be erected on a right of way it amounts to an abandonment of the easement. (*Vogler* v. *Geiss,* 51 Md. 407.) His acts in relation to the matter are binding on his successors in title. *King* v. *Murphy,* 140 Mass. 254; *Snell* v. *Levitt,* 116 N. Y. 595; *Warshauler* v. *Randall,* 109 Mass. 586.

The Commonwealth Company has built extensive improvements in reliance upon the vacation, and the property owners in the block, especially those consenting to the vacation, are estopped to demand that the original condition be restored. *People* v. *Wieboldt,* 233 Ill. 572.

The contract creates an easement, and not a license. *VanOhlen* v. *VanOhlen,* 56 Ill. 528; *Yeager* v. *Manning,* 183 id. 275.

An executed license coupled with an interest in the land is irrevocable. *Woodward* v. *Seely,* 11 Ill. 157.

The question whether the user of the easement by this appellee for an independent part of its business is exces-

sive depends upon whether the user has been made in good faith and is necessary for the reasonable enjoyment of the dominant estate. If the user, pursuant to the contract, is reasonably necessary for the enjoyment of the dominant estate and is not colorable, then the user is not excessive, even if other property is benefited. *Harris* v. *Flower,* 74 L. J. 127; *Finch* v. *Railway Co.* L. R. 5 Exch. Div. 254; *Williams* v. *James,* 36 L. J. C. P. 256; *Gunson* v. *Healy,* 100 Pa. St. 42; *Simpson* v. *Godmanchester,* L. R. App. Cas. 696.

JOHN T. RICHARDS, for appellee the Chicago Title and Trust Company, executor.

Mr. JUSTICE CARTER delivered the opinion of the court:

Easements may be created by covenants or agreements as well as by grant. (Jones on Easements, secs. 104, 106.) Agreements imposing burdens upon one estate for the benefit of another must be strictly construed. (*Eckhart* v. *Irons,* 128 Ill. 568; *Downen* v. *Rayburn,* 214 id. 342.) Such agreements, however, creating easements must be so construed as to carry out the plain intent of the parties. (*Field* v. *Leiter,* 118 Ill. 17; *Barber* v. *Allen,* 212 id. 125.) In construing such instruments the court will look to the circumstances attending the transaction, the situation of the parties, the state of the thing granted and the object to be attained, to ascertain and give effect to the intention of the parties. (*Kuecken* v. *Voltz,* 110 Ill. 264.) Construing this contract in the light of these surroundings, it seems obvious that its object was to furnish an outlet for business to the Burlington road for the lots between Allen's and Mason's canals. Not only is this indicated by the agreement, but that conclusion is supported by the terms of the contract entered into by the railroad company in 1864 with the owners of Greene's South Branch addition as to the right of property holders in said addition to build switches for business purposes from said

property to said railroad. The proposition that all the lots between said Mason's and Allen's canals south of Twenty-second street were to be permitted to use the curved switch track provided for in said agreement is further strengthened by the addenda made a part of the agreement, which provides that the owners of lots 101, 102 and 103 may use said curved track under certain conditions different from the conditions provided for the other lots in the main part of the agreement. Moreover, if there is any ambiguity as to the meaning of this contract, the practical construction placed thereon by the acts of the parties can be resorted to to determine the meaning of the grant. (Jones on Easements, sec. 389; *Walker* v. *Illinois Central Railroad Co.* 215 Ill. 610; *McLean County Coal Co.* v. *City of Bloomington,* 234 id. 90.) Such construction by the Beidlers and Witbecks shows that appellant's contention that only one track could be constructed south of the south line of lot 86 cannot be sustained, as several branch switches were constructed and in use south of that point for nearly forty years before these proceedings were started. It is obvious from the evidence in this record that the owners of lots 82 to 86 never claimed the right, under this agreement, to use the switches south of the south line of lot 86 from the time said agreement was executed until this controversy arose. Whatever doubt, therefore, there may have been under the original contract, this point must be held to be settled adversely to appellant's contention as to its present rights in said tracks south of the south line of lot 86. The fact that John H. Witbeck, who was the owner of lots 82 to 86 when said Fisk and Lumber streets were vacated by the city of Chicago, signed a petition requesting such vacation, shows clearly the intention of the then owner that the property might be used for private purposes and that any interest he might have therein was abandoned. His acts in relation thereto are binding upon his successors in title. (*Vogler* v. *Geiss,* 51 Md. 407; *King* v. *Murphy,* 140 Mass. 254.) We

cannot see how the vacation of Fisk and Lumber streets and the building of the fence across Fisk street, as heretofore set forth in the statement of the case, injuriously affected appellant's rights. Since such vacation the Commonwealth Company has built extensive improvements in reliance thereon, and the property owners in the block who consented to the vacation, or their successors in title, are estopped from demanding that the original condition be restored. *People v. Wieboldt,* 233 Ill. 572.

Had the practice of doing all the switching on the said curved track during the night time, except Sundays, been followed from the time the contract was executed, or even for twenty years continuously, and been adverse, such practical construction of the agreement would have tended strongly to uphold appellant's contention that the court below was wrong in deciding that the Commonwealth Company had unrestricted rights to the said easement day and night, but the facts as shown in this record indicate that the doing of such switching at night continued less than twenty years and was permissive rather than adverse. We are therefore disposed to agree with the holding of the trial court that the parties to said easement agreement, and their successors and assigns, have the right to use said switch track in common, for the purpose of transferring railroad cars at all times back and forth between said railroad track and the lots in question.

The contention is made that the easement created by said contract of February 28, 1865, was in gross and not appurtenant. This easement satisfies all the requirements of an appurtenant easement. The servient and dominant estates are clearly defined in the contract. An easement will not be held to be in gross if it can fairly be held to be appurtenant. (*Louisville and Nashville Railroad Co.* v. *Koelle,* 104 Ill. 455; *Kuecken* v. *Voltz, supra.*) If the dominant estate is clearly indicated and the easement is beneficial to such estate then it is appurtenant, and it is not necessary

that the dominant and servient estates should be contiguous or that the right of way should terminate, as claimed by appellant, on the dominant estate. (Jones on Easements, sec. 5; *Horner* v. *Keene,* 177 Ill. 390; *Cady* v. *Springfield Water-works Co.* 134 N. Y. 118.) We do not think *Garrison* v. *Rudd,* 19 Ill. 558, holds to the contrary.

It is further contended that section 13 of chapter 30, (Hurd's Stat. 1908, p. 491,) which provides that "every estate in lands which shall be granted, conveyed or devised, although other words heretofore necessary to transfer an estate of inheritance be not added, shall be deemed a fee simple estate of inheritance," etc., has no application to easements. As we understand the argument, it is that if a perpetual easement is to be granted, the word "heirs," or some other word that would convey a fee under the common law, must be inserted, and that the word "forever," as used in this agreement, does not answer that purpose. We think this question has been settled adversely to appellant's contention in *Tinker* v. *Forbes,* 136 Ill. 221, *Horner* v. *Keene, supra, Oswald* v. *Wolf,* 126 Ill. 542, and *Barber* v. *Allen, supra.* While the ruling of some courts is to the contrary, the weight of authority in this country agrees with the holdings of this court on this question. The dock company acquired a perpetual easement in the curved track across lots 82 to 86 as appurtenant to the lots owned by the dock company at the date of said easement contract,— that is, to lots 87, 88, 89, 90, 93 and the south half of lot 92. It is the settled law in this State that an easement created by a grantor in the lands of his grantee, in favor of the lands retained by the grantor and beneficial thereto, is appurtenant to the lands retained and binding on subsequent purchasers of the grantee's land. (Jones on Easements, sec. 392; *Kuecken* v. *Voltz, supra; Horner* v. *Keene, supra.*) Without question the authorities support the finding of the chancellor that the easement in said curved track under said agreement is appurtenant to said last named lots

for the benefit of the present owner, the Commonwealth Electric Company.

Appellant further insists that no person not a party to the easement contract can take the grant of an easement under it; that the easement contract is necessarily between the parties to it, and that only the dock company, or some one in privity with it, can successfully maintain a suit at law or in equity against the parties of the second part to enforce the provisions of said easement agreement. The trial court agreed with this contention as to a suit at law, but held, in effect, that this is a proceeding in equity and governed by equitable rules of procedure, and that therefore equitable defenses will be sustained and equitable rights enforced herein. (*Gage* v. *Caraher,* 125 Ill. 447.) Parol contracts for easements have frequently been given effect by the courts under the rule laid down by Jones in his work on Easements, (sec. 83,) that a parol contract for an easement, which equity will regard as equivalent to a grant, must be "made for a valuable consideration and accompanied by acts of part performance unequivocally referable to the contract." It has been held in this State that where a person, for a valuable consideration, makes a promise to another for the benefit of a third person, such third person may maintain an action upon such promise; and it is not necessary in such case that there should be any consideration moving from the third person in whose favor the promise has been made. (*Dean* v. *Walker,* 107 Ill. 540; *Webster* v. *Fleming,* 178 id. 140; *Ashelford* v. *Willis,* 194 id. 492.) Courts of equity will enforce agreements creating easements and restrictions on lands when the intention of the parties is clear. *Parker* v. *Nightingale,* 6 Allen, 341; *Hubbell* v. *Warren,* 8 id. 173.

Without attempting to set out the evidence in detail here, (it is referred to at some length in the statement of the case,) we think it is clear from this record that the owners of lots south of lot 86 served by the curved track

paid to the owners of lots 82 to 86 eleven-fifteenths of the original cost of the section of the curved track, as provided for in said easement contract; that this payment and acceptance was without question referable to the contract, and that the cost of maintaining said curved switch track to the south line of said lot 86 was likewise paid by the owners of lots south of lot 86 served by the curved track, in accordance with the terms of said easement agreement, and also clearly referable to it.

Appellant insists that the payment made under the said original contract should have been in the proportion of eleven-sixteenths to five-sixteenths instead of eleven-fifteenths to four-fifteenths, as shown by this record, and that as the Witbeck Company only paid in the proportion of four instead of five lots, the first contribution as to the original cost of the curved track cannot be referable to this agreement but must have been made under some independent agreement. While the first payment tends to uphold in some measure this contention, we think the testimony of Augustus Beidler and other evidence shows clearly that the payments, not only for the repair of the tracks but the original cost as provided for in such agreement, were made under this contract. Unless it was understood by the members of the Witbeck corporation and the Beidlers that such payments were being made under such contract, we can see no reason why the easement contract was restored by the then owners of the property and filed for record in 1874, after its destruction by the great fire in 1871.

We cannot sustain the claim of appellant that there can be no prescriptive rights as to some of the appurtenant lots because they were in the possession of tenants during the alleged prescriptive period. This claim is based on the argument that if the property is in the possession of a tenant the owner is prevented from acquiring an easement therein by prescription. This argument is answered by the fact that John H. Witbeck, who was then the owner of the ser-

vient lots, was collecting from the owners of the dominant lots moneys on account of the switch track,—and this during the time the tenants occupied the dominant lots. By reason of these payments and acquiescing in the user of the switch track by said appurtenant lots Witbeck waived all claim on this point. The evidence in this record shows conclusively that the owners of lots 87 to 93 and 33 to 39, inclusive, had been openly and notoriously using the said curved track for more than twenty years before this proceeding was instituted and in accordance with said easement agreement. The use of the curved track by said lots last mentioned being under the easement agreement and referable to it, the user must be held adverse. *Schmidt* v. *Brown,* 226 Ill. 590.

Appellant further contends that if it be assumed that the easement contract granted an easement for the benefit of any land fronting on Fisk or Lumber street, provided the owners accepted its conditions, such easement does not extend to the center of the street on which such lots abut. The determination of this question depends very largely on whether the plat of Greene's South Branch addition to Chicago conformed to the requirements of the statute in force at the time such plat was made. The record shows that the plat of the subdivision was executed and acknowledged by certain of the owners by their attorneys in fact. This was not in compliance with the statute. *Blair* v. *Carr,* 162 Ill. 362; *Gosselin* v. *City of Chicago,* 103 id. 623; *Russell* v. *City of Lincoln,* 200 id. 511.

It is argued, however, that Hance and Greene were the owners of all the property east of the center line of Fisk street at the time this plat was made and that they acknowledged the plat in person, and that therefore the plat as to the property they owned is a statutory plat, even though as to the other parts the owners did not comply with the statute,—that is, part of the plat is statutory and part common law. We cannot assent to this proposition. The plat is an

entirety. If any of the owners of property covered by the plat failed to comply with the statute it destroyed the validity of the entire plat as a statutory dedication. At the time the agreement was entered into, Fisk street had not been accepted by the public and the title of the abutting lot owners therefore extended to the center of the street. (*Hamilton* v. *Chicago, Burlington and Quincy Railroad Co.* 124 Ill. 235.) Parties will be presumed to have contracted with reference to lots by their legal boundaries. Upon the acceptance of Fisk street by the public the public easement became a charge upon the title of the property owners. Such private rights, however, have remained, subject only to the right of passage and use by the public. It appears to be conceded that the vacation of these streets was in accordance with the law. Such vacation, therefore, destroyed the public easement and restored the parties to the full enjoyment of their private rights in said lots. Manifestly, the easement under said contract extended to the center of the street on which the appurtenant lots in question abutted,— that is, the easement extended to the center of Fisk and Lumber streets as to lots 87 to 93, inclusive, and lots 33 to 39, inclusive.

The trial court held that lots 94 to 97 were not shown by the record to have any rights in this easement contract. We think this holding was correct. At the time the easement agreement was executed and the deed given by the South Branch Dock Company to the Witbecks for said lots 82 to 86 Caleb Allen was the owner of lots 94 to 97. As has been stated, he did not purchase stock in said dock company. While it is clear that it was intended that all of the lots between Mason's and Allen's canals, including those owned by Allen, should have the benefit of the easement contract under the conditions provided therein, no proof is found in the record that the owners of lots 94 to 97 contributed in any way to the original cost of the curved track or towards its repair. While there is some slight evidence

in the record that tends to show that some of the parties who occupied these lots, in connection with certain lots east of Fisk street, for lumber business used the curved track for the purpose of taking lumber to and from said lots 94 to 97, still this proof is very indefinite as to dates, length of time and amount of lumber moved. Indeed, the proof tends very strongly to show that said lots 94 to 97, inclusive, during most, if not all, of the time from the date when this contract was signed down to the time this controversy arose, used the switch track west of Fisk street, which curves south-easterly across said lot 105, for carrying materials between said Burlington road and the lots in question. It necessarily follows from what has been heretofore stated, that the right to use said curved switch track under said agreement is not attached to the west half of the vacated portion of Fisk street originally included within said lots 94 to 97; and it also follows that the trial court was right in holding that the Commonwealth Company, its successors and assigns, are not entitled to maintain the existing connection between said curved switch track and the track constructed by said company in 1902, branching towards the west from the track in Fisk street opposite the dividing line between said lots 88 and 89, as shown on plat 3.

In view of the conclusions heretofore reached that certain lots are appurtenant or dominant to and certain other lots are non-appurtenant or non-dominant to said easement in the said switch track, one of the most serious and far-reaching questions in this record is whether the present use of said curved switch track by the Commonwealth Company is excessive. The master reported and the court decreed that the easement was not appurtenant to the vacated portion of the west half of Fisk street,—that is, the land which had been a part of that street and was originally included in the eastern ends of said lots 94 to 97. The stipulation filed in this case shows that the ten turbines and generators for supplying electricity in this plant are located on this va-

cated portion of Fisk street; that at least one-half of each turbine is west of the center line of Fisk street. The precise question thus presented has never been passed on by this court, nor, so far as we are advised, by any other court. Somewhat similar questions, however, have been considered. In Jones on Easements (sec. 32) that author states: "An easement cannot be extended or made to attach to land other than for the benefit of which it was created. It cannot be made to attach to other land which the owner of a dominant estate may subsequently acquire. * * * A land owner conveyed part of his land to a stone company, together with a right to construct a line of railway over the remaining part to connect the land granted with a public railroad. (*Hoosier Stone Co.* v. *Malott,* 130 Ind. 21.) It was held that this easement was appurtenant to the land granted, and the stone company had no right to permit its use by third persons to convey stone quarried on lands owned by them." Again, that author states (sec. 360): "One having a right of way appurtenant to certain land cannot use it for the benefit of other land to which the right is not attached, although such other land is within the same enclosure with that to which the easement belongs. Except for this rule the burden upon the servient estate might be increased at the pleasure of the owner of the dominant estate. This rule is therefore applicable whether the way was created by grant, reservation, prescription or as a way of necessity. * * * The way is granted for the benefit of the particular land and its use is limited to such land. Its use cannot be extended to other land, nor can the way be converted into a public way without the consent of the owner of the servient estate. One having a right of way to his land blackacre over the land of another has no right to drive his cattle to blackacre and then to other land beyond it." *Howell* v. *King,* 1 Mod. 190.

A owned three lots, all of which were embraced in one pasture, and had the right to cross other land to go to

one of these three lots. He crossed this other land and went to one of his lots not dominant to the easement for the purpose of salting sheep, and on his return was assaulted by the owner of the land subject to the easement. The court held that he was a trespasser. *French* v. *Marstin,* 32 N. H. 316.

A person had a right to go over certain land to reach a three-acre lot. Adjoining this lot he also owned a nine-acre lot, the two not being separated by any fence. Having mowed the grass on his two lots he proceeded to load the hay, each load containing hay cut from each of the lots. An action in trespass was sustained. The court held that he could only enter the other party's land to go to the three-acre lot. *Davenport* v. *Lamson,* 21 Pick. 72.

One Jenkins was the occupant of a field called "nine-acre field" and of two adjoining fields called "Parrott's land." The nine-acre field had a right of way over plaintiff's land to the public highway. Jenkins mowed all three fields and stacked all the hay, in good faith, on the nine-acre field, afterward selling it to the defendant, James, who carried it across plaintiff's land to the highway, which was the alleged trespass. It was held that this was *not* an excessive user of the right of way. *Williams* v. *James,* 2 L. R. C. P. 577.

A private carriage road had been established for many years as a means of reaching certain enclosures of meadow and woodland. Afterward Finch and others acquired a portion of the premises, including the fee (subject to the easement) of the road, and erected thereon a large lunatic asylum. The defendant railway company acquired title to another portion of the premises and maintained thereon a cattle-pen, where large numbers of cattle were driven by means of the road and were collected and were then driven over the road to the railroad for shipment. Plaintiffs objected on account of the noise. The court held that this was a lawful user on the part of the railway company, and

that said company was not restricted to the user which existed at the time of the grant. *Finch* v. *Great Western Railway Co.* 5 L. R. Exch. 254. See, also, on this point, *Reise* v. *Enos*, 76 Wis. 634; *Webber* v. *Vogel*, 159 Pa. St. 235; *Greene* v. *Canny*, 137 Mass. 64; *Albert* v. *Thomas*, 73 Md. 181.

While the general principles that must control are easily stated, their application to the complex and intricate machinery of modern civilization is not in all cases simple or clear. Some decisions of recent date have been handed down that are more closely in point than the authorities heretofore referred to. An easement was imposed on certain land in favor of a lot called therein for convenience the "pink land," and afterwards a building was erected partly on said "pink land" and partly on adjoining premises called the "white land," which was not subservient to the easement. It was desired to use the building for manufacturing purposes and to use this easement for hauling and freight traffic for the benefit of all the building. The court refused such use. *Harris* v. *Flower*, 74 L. J. Ch. 127.

An automobile garage was erected on two lots, one of which was entitled to an easement over an alley connecting with the streets. The automobiles from the garage, both that part situated on the land dominant to the easement and that part not on said land, passed in and out of the alley. The court held that the proprietor of the garage might use the alley as appurtenant to that part of the garage dominant to the easement but not as a means of ingress or egress to and from the other portion of the garage by means of the portion which was dominant. *Diocese of Trenton* v. *Toman*, 70 Atl. Rep. (N. J.) 606.

A partition deed embracing a number of lots contained a provision that a certain alley should "be forever left open as a means of ingress and egress for the advantage of all the property hereinbefore conveyed and partitioned." Afterward the Broad Exchange Company acquired title to

one of said lots and to certain other lots not included in said partition deed, and proceeded to erect on all of said lots a large office building, designed for the accommodation of some seven thousand occupants. The heat and power plant was located on the premises dominant to the easement. The coal, ashes, paper and sweepings of the entire building were conveyed through the alley. The court issued an injunction against the owner of the building and its agents from using the easement until such time as the building should be so arranged as to permit the use of the easement for the advantage of the dominant tenement only. *McCullough* v. *Broad Exchange Co.* 101 N. Y. App. 566.

Counsel for the Commonwealth Company argue that as that company has so arranged its entire plant that the part which contains the boilers is on the dominant estate the use of the easement is not excessive, as the company uses the switch track to the dominant estate for the purpose of transferring coal to the furnaces and boilers located on the dominant estate, where the coal is consumed, and the ashes and cinders are then hauled away from the dominant estate over the track. They argue that the steam plant is located next the dynamo plant, where electricity is generated, and that the dynamo plant cannot be considered appurtenant to the easement, under these circumstances, any more than it could if the steam had been piped under the river to turbine wheels on the south side of said river; that the relative location of the steam plant and the dynamo plant is immaterial; that the use of the easement in hauling freight over the switch is not only within the letter but within the spirit of the contract, and counsel insist that the only question presented is whether such use of the easement is within the terms of the grant,—is unlawful and excessive because adjacent property receives benefit therefrom. To support their contention, counsel for the Commonwealth Company rely upon certain of the authorities heretofore cited, but especially upon the case of *Simpson* v. *Godmanchester,* L. R.

App. (1897) 696. In that case the court had under consideration the use of an easement to prevent the flooding of dominant lands. This easement consisted in the right to open sluices for the purpose of protecting from inundation certain lands adjoining the river, and had been exercised for two hundred years in times of actual or threatened flood. A suit was brought to restrain the exercise of this right, and it was held by the court that the lands that had so exercised it in previous years could still continue to exercise it, even though by so doing other lands not dominant were benefited, holding that "it is no objection to the exercise of a lawful right that it may indirectly benefit other persons or subjects which do not enjoy the same right." We think, however, the question in that case is clearly distinguishable from the one here presented. In that case no greater burden was imposed upon the servient estate, but here the burden imposed is increased and is in excess of the grant under the said easement agreement by the building being located partly on non-dominant estate, as herein set forth.

Counsel for the Commonwealth Company insist that if the rule contended for by appellant be upheld, a steel plant could not use a switch to haul iron and coal for the manufacture of steel billets onto the dominant estate if the billets were subsequently to be rolled into rails on non-dominant lands; that a furniture factory could not use the switch in connection with the manufacture of furniture if the furniture was subsequently to be finished on non-dominant lands; that a car company could not manufacture car wheels on dominant property and use the easement if the wheels were to be subsequently attached to cars on non-dominant property. Under all these illustrations it is argued that other lands would receive the benefit of such use. If this argument were sustained then the Commonwealth Company could have constructed a very small part of its building, containing only the boilers, on the appurtenant lots and

could have erected all the rest of the plant on non-dominant property, even though the plant covered acres of ground. No arbitrary or absolute rule can be laid down that will control in every case. The peculiar or special facts of each case must necessarily be taken into consideration in reaching a decision. As a general proposition, however, we think, if the entire plant is operated as a whole, that any integral, necessary or indispensable part of the entire plant cannot be situated on non-dominant estate. As we understand the question on this record, it is necessary for the creation of electricity not only that the boilers make the steam, but, as a part of the same creative act, the steam must be used in the turbine wheels to propel the generators, and the generators must at the same time be used for the purpose of generating electricity,—that is, the steam cannot be created as an independent factor. It cannot be tranferred to non-dominant estate, and thereafter, an appreciable period of time intervening, used, by a distinct and independent act, for generating electricity, the same as the billets of steel can be transferred from dominant to non-dominant estate and later on changed into the form of rails, or the same as car wheels manufactured on dominant estate can afterwards be transferred to non-dominant property to be used in making cars. The steam plant is not a part of this plant distinct and separate from that part of the plant which generates the electricity. The two are connected together and both are essential in the operation of the electrical plant. How can it be said that they are any more distinct parts of the same plant than that the brain and heart are distinct and each working independently of the rest of the human body? The generators and steam plant are both a part of one uniform and indivisible plant and process. These turbines and generators cannot be operated without the continuous support and application of the steam. Counsel for appellant well argue that this steam plant is no more independent of the rest of the plant than would a steam plant on dominant

land in a flouring mill be from the shaft and machinery which grinds the grain on non-dominant land.

Counsel for the Commonwealth Company argue that the use of the switch by the non-dominant property is a reasonable one for the purposes of the dominant property, and that the Commonwealth Company erected its plant in good faith, without intending to subject the easement to a greater burden than was intended when the contract was originally entered into. We are inclined to think that this contention is sound to the extent of holding that the use of this unrestricted way is in good faith and reasonable in so far as the change of use is rendered necessary by using the dominant or appurtenant lots for their present use, instead of the former use of the curved switch track for lumber yards, but we do not think this rule of law can apply to its present use by the non-dominant lots. On principle and authority the holding of the trial court on this last point cannot be sustained. The entire plant of the Commonwealth Company, as shown on plat 3, both east and west of the center line of Fisk street, must be held to be one integral, indivisible and entire whole, and the use of the switch in hauling coal for this entire plant must be held to be an excessive user. The decree of the chancellor should have so found.

We are also disposed to hold that the trial court improperly decided that under this agreement the Commonwealth Company had the authority to connect the branch switch, as shown on said plat 3, opposite the middle part of said lot 85. Most favorably construed for the Commonwealth Company's contention, we do not think this easement contract by its terms was intended to allow more than one track north of the south line of said lot 86.

It is contended, however, that the construction placed upon this contract by the parties interested in years past permitted a branch or extra switch to be connected and built north of said south line of lot 86. The proof as to any

switch being built north of said south line of said lot previous to 1902 is not at all clear or satisfactory. It is true, there is some evidence in the record that one switch track branched off from the main branch or switch at some point opposite lot 86, but just how far north of the south line of said lot no witness testified, though all the evidence is that no switch track ever branched off north of lot 86.

Counsel for the Commonwealth Company contend that, even if this state of facts be admitted, appellant not having raised this question until the amendment of its petition filed in 1908, it therefore waived its right to raise it. Even if John H. Witbeck stood by and permitted the construction of the switch track without objection, it cannot be held that the Commonwealth Company acted in ignorance of its rights, and no delay short of the statutory period will bar the relief contended for. *Burrall* v. *American Tel. Co.* 224 Ill. 266; *Spalding* v. *Macomb and Western Illinois Railway Co.* 225 id. 585.

We think we have covered all the material points raised on this record. The facts are complicated and many of the questions difficult. We have been greatly aided in our study of the case by the well arranged and able briefs of counsel, together with the very complete statement of facts in the report of the special master.

The decree of the superior court will be reversed and the cause remanded, with directions to re-enter the decree modified in accordance with this opinion, so as to enjoin and restrain the appellee the Commonwealth Electric Company, its officers, agents and employees, from using said easement over said curved switch track in connection with any lands which (as specified in this opinion) are not dominant to said easement; also to enjoin and restrain said company, its officers, agents and employees, from using the said easement over said curved switch track in connection with the building containing the generating plant, until such

plant is so arranged as to permit the use of said easement for the advantage and benefit only of the lands that are dominant to it, without by the same act subjecting the easement to use in connection with non-dominant lands; also to enjoin and restrain said company, its officers, agents and employees, from the use of the switch track which branches off from the east of said main curved track opposite lot 85, unless and until said switch track is changed and re-built so as to connect with said main curved track not farther north than the south line of lot 86. In all other respects the decree will remain unchanged.

*Reversed and remanded, with directions.*