(No. 27036.—

CHICAGO TITLE AND TRUST COMPANY, Trustee, *et al.*, Appellants, *vs.* WABASH-RANDOLPH CORPORATION *et al.*, Appellees.

*Opinion filed Sept. 21, 1943—Rehearing denied Nov. 11, 1943.*

MARKHEIM, HUNGERFORD & SOLLO, and JAMES S. SHANNON, (HARRY MARKHEIM, of counsel,) for appellants.

WILSON & McILVAINE, and ALLEN G. MILLS, (J. F. DAMMANN, CLARENCE E. FOX, and JOHN A. JOHNSON, of counsel,) for appellees.

Mr. JUSTICE MURPHY delivered the opinion of the court:

By this appeal plaintiffs-appellants seek to reverse a decree of the superior court of Cook county which dismissed their complaint for want of equity. The controversy is as to whether there is appurtenant to lots owned by plaintiffs a perpetual easement of ingress and egress over lots owned by defendants. The easement in question is a freehold estate and this court has jurisdiction on direct appeal. *Wessels* v. *Colebank,* 174 Ill. 618.

The Chicago Title and Trust Company appears in this case as a trustee under a certain trust agreement and as

such holds the legal title to the lots for the benefit of which the easement is claimed. The estate of Zouella D. Cardwell is the beneficial owner under the trust. The trustees and the executors of the Cardwell estate will be referred to as plaintiffs. Gorham Brooks *et al.*, are made defendants as trustees under a certain trust instrument in which capacity they hold the legal title to the lots which plaintiffs claim are the servient estate. Wabash-Randolph Corporation is the assignee of a 99-year lease on the lots held in the foregoing trust. Marion E. Markie is a tenant in possession of a part of the particular 10-foot strip over which the easement is claimed. The interests of the several defendants in the result of this litigation are the same and they will be referred to collectively as defendants.

The lots owned by plaintiffs and defendants were originally platted in 1839 as a part of block 10 in Ft. Dearborn addition. They were designated as numbers 31, 32, 33 and 34. They extended from Randolph street on the south to Benton place on the north and were parallel to Wabash avenue.

The title of all parties in this litigation runs back to a common source in Martin O. Walker. On October 3, 1863, Walker entered into a contract with Charles B. Farwell whereby Walker covenanted to convey to Farwell a strip 40 feet in width off the north end of all of said lots, thus designating a tract with a frontage of 40 feet on Wabash avenue and approximately 96 feet in length. It parallels Benton place and is referred to in the record as the north lot. The Walker-Farwell contract contained provisions for a party wall which gave Farwell the right to erect the south wall of his building on the boundary line between the north lot and the remainder of said lots 31 to 34, inclusive. Provision was made for Walker's use of the wall in the construction of a building on the parts of the lots not sold to Farwell and for such privilege he was to pay Farwell one-half the cost of the wall. The

contract also contained the following: "Walker reserves the right of a passageway of 10 feet wide on the east end of said premises like unto that on the east end of the building now occupied by the firm of Cooley, Farwell & Co., but this reserve shall not be construed to prevent Farwell from extending his basement and all the upper stories over the entire area of said premises sold as aforesaid."

About 9 months after the Walker-Farwell contract had been made, and on July 19, 1864, Walker entered into a contract with Edward and Michael F. McKey, to convey to them the remainder of said lots 31 to 34, both inclusive. The contract contained the following pertinent provisions: "and the said Edward McKey and Michael F. McKey further covenant and agree that they will assume, discharge and fulfill the agreements and obligations of the said Martin O. Walker to Charles B. Farwell and his assigns respecting the use of and payment for one-half of the party wall erected by said Farwell on the north line of the premises above described, and that they will in building upon said premises leave an alleyway along the east side of said premises conforming in all respects with the arched alleyway left by said Farwell at the rear of the building erected by him upon the north end of said lots, said alleyway to be left open for the common benefit of all persons owning or occupying any portions of said lot." Both contracts were duly recorded.

Plaintiffs' theory is that the reference to the alleyway in the last quoted provision created an easement over the lots described in the Walker-McKey contract for the common advantage of all of said lots and the north lot. Defendants contend that no easement was created. They also argue that even though the language in the Walker-McKey contract be deemed to be sufficient to create an easement, there is another obstacle in that the deed made by Walker to the McKeys contained no reference to the easement and that all the provisions of the contract were

merged in the deed and therefore the McKeys' contractual obligation to create an easement was nullified. Defendants also say that if an easement was created the evidence shows that there was a subsequent abandonment. On the issues thus formed, the master found an easement had been created, that it still existed and that plaintiffs were entitled to a mandatory injunction to compel defendants to remove the obstructions in the passageway. On a hearing on exceptions to the master's report, the chancellor sustained defendants' exceptions and found that plaintiffs were not entitled to the relief prayed and dismissed plaintiffs' complaint for want of equity. He did find, however, that there was an easement over plaintiffs' property for the use of defendants' property and provided for its use in the decree.

Other facts material to the inquiry as to whether an easement was created are as follows: On February 20, 1866, Walker executed a warranty deed conveying the north lot to one Briggs who held the Walker-Farwell contract as assignee of Farwell. The same day Walker conveyed the remainder of said lots by warranty deed to the McKeys. Both deeds were duly recorded. The deed to Briggs contained the following reservation "saving and reserving however, passageway 10 feet wide across the east end of the premises hereby conveyed to be preserved in good condition for the ingress and egress of persons and teams, but without prejudice to the right of the said party of the second part (J. Smith Briggs), his heirs and assigns, to extend a basement and upper lofts or stories above the main or ground story of buildings erected or to be erected on said premises under and over said passageway in such a manner as not to obstruct its use for the purposes aforesaid." The Walker-McKey deed contained reservation for the party-wall agreement referred to in the Walker-McKey contract but made no reference to the easement.

On September 17, 1866, a plat for a subdivision of lots 31 to 34, both inclusive, except the north lot which had been conveyed to Briggs, was filed for record, to be known as the Bowen-McKey subdivision. By the subdivision the new lots extended east and west with a frontage of about 40 feet each on Wabash avenue and a depth of approximately 96 feet. They were numbered in consecutive order, 1, 2 and 3, starting at Randolph street and going north. The Bowen-McKey subdivision plat contained no reference to an alleyway on any of the lots. Defendants are the owners of lots 1 and 2 and plaintiffs of lot 3 and the north lot which was originally conveyed to Briggs and was not subdivided in the Bowen-McKey plat.

Plaintiffs' complaint contained an allegation that for many years prior to 1923 a private alley 10 feet in width extended across the rear of all of the lots owned by plaintiffs and defendants. Such allegation was denied in defendants' answer. There is no direct proof as to when the alleyway was first opened, but the evidence does show that when the buildings were erected on the north lot and lot 1, openings were provided approximately 10 feet in width to the height of the first story. The alleyway on lots 2 and 3 was open to the sky. There is evidence which tends to show that some use was made of it prior to 1923 and there is evidence that the entrance at Randolph street had iron gates across it. Further discussion of the evidence as to the use of the alleyway prior to 1923 will be reserved for the discussion on the question of abandonment.

Approximately thirty instruments, which include deeds, mortgages, trust instruments and leases, all connected in some way with the chain of title to lots 1 and 2, have been filed for record since 1866. In eighteen of them no reference was made to the existence of an easement. Twelve of them, in varying language, contained statements

recognizing the existence of an easement. To illustrate, a deed, dated December 3, 1888, provided: "This conveyance is made subject to any rights or easements that may have been acquired over the east 10 feet of said premises for an alley," and a mortgage dated in December, 1890, was made "subject to the existing easement appurtenant to the east 10 feet of said premises used as a private alley." A deed in 1916 contained the clause, "subject to existing easement appurtenant to east 10 feet of said premises (lots 1 and 2) used as a private alley," and one dated in January, 1932, contained a similar provision.

Plaintiffs pray for the extraordinary equitable remedy of a mandatory injunction to protect their rights in an easement over defendants' property. Whether such an easement exists is one of the main issues in the case, and under such circumstances the rule is that before equity will take jurisdiction to protect rights under such an easement the proof must be clear and convincing, so as to remove every substantial doubt of the existence of such rights. (*Feitler* v. *Dobbins,* 263 Ill. 78.) It has also been said that "Restrictions on the use of property held in fee are not favored, yet where the intent of the parties is clearly manifested in the creation of restrictions or limitations upon the use of the grantee, for the benefit of the grantor, his heirs or assigns, a court of equity will enforce the same." *Eckhart* v. *Irons,* 128 Ill. 568.

The general rule is that two distinct tenements are necessary to the creation of an easement,—the dominant to which the right belongs, and the servient upon which the obligation rests. (*Willoughby* v. *Lawrence,* 116 Ill. 11.) An easement creates an interest in land and must be founded on a deed or other writing, or on prescription which presumes a previous grant. (*Brunotte* v. *DeWitt,* 360 Ill. 518; *Traylor* v. *Parkinson,* 355 Ill. 476; *Boland* v. *Walters,* 346 Ill. 184.) Easements may be created by covenants or agreements as well as by grant. (*Goodwillie*

*Co.* v. *Commonwealth Electric Co.* 241 Ill. 42.) Such agreements must, however, be construed so as to carry out the plain intent of the parties. (*Barber* v. *Allen,* 212 Ill. 125; *Field* v. *Leiter,* 118 Ill. 17.) The general rule is that where an easement is created by express terms the rights of the parties must be ascertained from the words of the grant, yet this is subject to the modification that surrounding circumstances may be considered solely for the purpose of determining the intention of the parties in making the grant. *Louisville and Nashville Railroad Co.* v. *Koelle,* 104 Ill. 455.

In the making of the contract with the McKeys, Walker recognized that a few months prior thereto he had contracted to sell the north lot to Farwell, for in the McKey contract he made provision for the McKeys to assume the obligation he had undertaken in the Farwell contract to pay for a part of the party wall whenever he erected a building on the adjoining lot. He had agreed in the Farwell contract to deed the land subject to the burden of an easement and it may be reasonably inferred that it was his wish that the lots he was then contracting to convey to the McKeys should be burdened with a like easement of ingress and egress for the benefit of the Farwell lot. The language used in the Walker-McKey contract in reference to the alleyway needs no construction to determine its meaning. It is plain and unambiguous and provided that the passageway "was to be left open for the common benefit of all persons owning or occupying any portion of said lots." The term "said lots" evidently referred to lots 31 to 34, inclusive, for, at the time of making this contract, the Bowen-McKey subdivision had not been made a matter of record, so that the reference to "said lots" referred to the lots as shown by the original plat. No particular words are necessary to constitute a grant, and any words which clearly show the intention to give an easement, which is by law grantable, are sufficient to

effect that purpose. (19 C. J. 906.) While easements are usually created by grant or prescription, they also may be created by covenants or agreements, for such agreements are in legal effect grants. (*Goodwillie Co.* v. *Commonwealth Electric Co.* 241 Ill. 42.) The only reasonable conclusion to be drawn from the two contracts is that the parties intended to create a burden of ingress and egress over the east 10 feet of each of said lots for the common benefit of all the other lots in said group.

Defendants contend that the two contracts and the two deeds made in consummation of the contracts must be, as to the question of easement, considered together, and that when so considered it should be held that the Walker-McKey contract was merged in the deed. If there was a merger, then the absence of an easement provision in the deed would render such provision in the contract ineffective. In the citation of cases on this point both parties recognize the principle that distinguishes those cases where the delivery of the deed constitutes a complete fulfillment of all the terms of the contract and those cases where the contract contains provisions which delivery of the deed does not execute and as to which there is no merger, but they differ as to the class to which this case belongs.

The Walker-McKey contract is not abstracted in full, but there is sufficient appearing in the abstract to show that Walker was to deliver a warranty deed to McKeys whenever they paid the purchase price. These acts, that is, the one of payment and the other of delivery, were concurrent in point of time. Where such acts are to be performed concurrently the title does not pass until performance. (*Robinson* v. *Yetter,* 238 Ill. 320; *Roddin* v. *Shurley,* 66 Ill. 23.) The McKeys had no title to the lots until they paid the purchase price and received the deed, which acts did not occur for about two years after the contract was made. During that interval, the McKeys had no

title upon which the burden of an easement could rest. However, when the purchase price was paid and the deed delivered, the title passed and the agreement of the Mc-Keys to create an easement over the lots they were purchasing became effective and operated to create the burden of an easement upon each of the McKey lots. By the contract they were to acquire the title to the lots whenever they paid the purchase price, and the creation of an easement over their lots was an interest in their real estate and one which they had a right to contract in reference to before they acquired their title.

The principles in reference to merger are well settled. If the terms of a contract for sale of real estate are fulfilled by delivery of the deed, there is a merger, (*Weber* v. *Aluminum Ore Co.* 304 Ill. 273,) but if there are provisions in the contract which delivery of the deed does not fulfill, then the contract is not merged in the deed as to such provision and the contract remains open for the performance of such terms. (*Trapp* v. *Gordon*, 366 Ill. 102; *Biewer* v. *Mueller*, 254 Ill. 315; *Shelby* v. *Chicago and Eastern Illinois Railroad Co.* 143 Ill. 385.) The agreement of the McKeys to establish an easement could not become effective until after delivery of the deed, therefore, by its delivery the easement provision was not merged in the deed.

Defendants stress as important the fact that there was no provision in the Walker-McKey deed in reference to the easement. The answer is that the covenant as to an easement was the agreement of the McKeys and that it was not necessary for them to sign the deed in which they were named as grantees. Had the McKeys accepted a deed with such a provision inserted, there would have been a basis for the operation of the principles of estoppel but that is aside from defendants' theory that failure to set it forth in the deed operates in some way to show that

the parties, between the signing of the contract and delivery of the deed, concluded to abandon the contractual provision to create an easement.

The agreement of the McKeys as contained in the Walker-McKey contract was sufficient grant to create an easement. The construction of the buildings on the north lot and lot 1 with an opening for an alleyway leaves little room to doubt that the parties intended to create an easement of ingress and egress over the east 10 feet of all of said lots and that it was created for the common benefit of all of such lots.

The arguments on the question of abandonment of the easement bring out certain facts in reference to the ownership of the lots when the abandonment occurred and the conduct of the parties, which it is necessary to relate. In 1923 the legal title to the north lot was held by the Chicago Title & Trust Company in trust, and James R. Cardwell was the beneficial owner. (Defendants contend Zouella Cardwell, the wife of James R. Cardwell, was the real party in interest, but under the views expressed that is immaterial.) The title to the north lot has been held in such ownership from that time to the present, except that whatever interest Zouella Cardwell had in the property is now represented by the executors of her will. As to lot 3, it appears that on March 20, 1914, John W. Barr, Jr., as trustee, the then holder of the legal title to lot 3, demised the same to William Holabird for a term of 99 years. On August 18, 1914, Holabird assigned the lease to James R. Cardwell and he continued as owner until March, 1934, when the leasehold was extinguished. At that time the legal title which had been held by Barr was conveyed to the Chicago Title & Trust Company under a trust agreement, under which the estate of Zouella Cardwell is the beneficial owner. As to lots 1 and 2, it appears that on May 1, 1916, Luther W. Bodman, the then owner, leased the same to A. Starr Best, Inc., for a period of 99 years.

In May, 1923, A. Starr Best assigned the lease to James R. Cardwell, as trustee, to secure the payment of a note of $100,000 payable 5 years after date. The trust deed in which Cardwell was trustee was released in June, 1926, and at or about that time Cardwell became the owner as assignee of A. Starr Best, Inc. He continued as the owner of such lease from June 22, 1926, to January 5, 1935. On the latter date he assigned it to Wabash-Randolph Corporation. In September, 1935, Gorham Brooks *et al.,* as trustees, contracted to purchase lots 1 and 2 from Bodman and to acquire all the issued and outstanding capital stock of the Wabash-Randolph Corporation. By such transaction they became the holders of the fee title to said lots 1 and 2 and the owner of all the capital stock of the corporation, which owned the 99-year lease.

It was stipulated that for about twelve years prior to the acquisition of the lease by the Wabash-Randolph company the south 38 feet of the east 10 feet of lot 1 had been enclosed and occupied by defendant Markie as a store for business purposes. During the period the Wabash-Randolph company owned the lease, Markie paid rentals for such space. Plaintiffs did not receive any portion of the rental paid during such period. On or about August 19, 1937, plaintiffs served a notice on Brooks *et al.,* as trustees, and Wabash-Randolph Corporation notifying the defendants of plaintiffs' claim of their rights in the easement.

The circumstances under which the alleyway upon the south 38 feet of lot 1 was inclosed are as follows: In 1923 Cardwell and A. Starr Best entered into a verbal agreement whereby A. Starr Best, Inc., was to cause the space to be enclosed by two walls, the south one on the Randolph street line and the other 38 feet north of such line. The terms of the agreement were testified to by Cardwell, A. Starr Best and Newton B. Lauren, who was Best's agent. They are in substantial agreement as to its terms and their evidence is uncontradicted. The Bodman-

Best 99-year lease contained a provision whereby Best, Inc., was to erect a new building of certain dimensions on lots 1 and 2 within a fixed period. By subsequent agreements, the time for the erection of the new building had been extended to May 1, 1938. The limitation of time for the closing of the alley is important. On this point the master found that at a meeting where Best, Cardwell and Lauren were present, Best stated that it was his desire to improve the appearance of the store building in which Best, Inc., was located and that he desired to derive some revenue from a proposed store structure by closing part of the alleyway; that Cardwell agreed to such a proposition and that the company was to erect a temporary store structure over such alleyway, pay the cost thereof, reimburse itself for the same out of the rentals and divide the balance equally between Cardwell and the company. The master further found that Cardwell stated that he would consent to such an arrangement, provided the lease of such passageway space would terminate not later than the time when Best, Inc., was obligated to erect a new building under its 99-year lease. The evidence fully supports such finding.

After such arrangement was made the passageway was closed. After the cost of the enclosure had been paid, a difference arose between Best and Cardwell as to the proportion each should receive of the rentals and they agreed to arbitrate such difference. The arbitrators awarded one half of the rentals to each of the parties, which arrangement continued until Cardwell acquired the lease June 26, 1926. Thereafter he received all the rentals until he assigned the lease to Wabash-Randolph Corporation. During the period of Cardwell's ownership of the lease, he remodeled the building and changed the outward appearance so that the lines marking the alleyway were no longer visible. It will be observed that the part enclosed included

only the south 38 feet of the 10-foot space across lot 1, thereby leaving an area of approximately ten feet in width on the north side of lot 1 which remained unobstructed. It is claimed that this furnished the occupants of lot 1 access to the alley and is evidence of an intent not to discontinue the use of the alley even as to lot 1.

There is no claim that Cardwell had any authority, by virtue of his 99-year lease on lot 3 or otherwise to represent the owner of that lot in agreeing to abandon the easement. The unauthorized agreement of the tenant to abandon the easement would not be binding on the lessor. The Bodman-Best lease on lots 1 and 2 contained a provision that the premises were demised "subject to the existing easement appurtenant to the east 10 feet of said premises used as a private alley." It also contained an authorization from the owner to the lessee to contract in reference to the easement. The clause provided "said Lessor (Luther W. Bodman) hereby consents and agrees that said Lessee (A. Starr Best, Inc.) shall have the right to enter into any agreement with the adjacent holders of property that has for its object the vacating, releasing and cancellation of the existing easement appurtenant to the east ten (10) feet of said premises used as a private alley, provided, however, no obligation or penalty shall be imposed upon Lessor by virtue of said agreement."

The evidence relating to the use of the passageway just prior to its enclosure shows that at the Randolph street entrance the curb of the sidewalk was approximately a foot higher than the street level, making it impossible to drive a vehicle to or from Randolph street through the alleyway without a sidewalk approach. It was also shown that no permit had been obtained from the city of Chicago in accordance with its ordinances to drive across the sidewalk at this entrance. For a part of the time iron gates were maintained across the entrance at Randolph street.

There is a conflict in the evidence as to the extent the alleyway was used by the owners and those in possession of the abutting property.

The contract by which Brooks *et al.,* trustees, acquired the property from Bodman contained a provision that there was an easement over the east 10 feet of said premises for a private alley. A special warranty deed made pursuant to the terms of the contract made no reference to the easement.

As noted, the easement was created by grant and therefore it could be terminated only by grant or by abandonment. It could not be lost by mere nonuser, (*Yunkes* v. *Webb,* 339 Ill. 22; *Hofherr* v. *Mede,* 226 Ill. 320,) but failure to use for the purpose created may become a circumstance to be considered on the question of intent. Where an abandonment is claimed, the intention to abandon is the material question. The intent may be proved by a variety of acts, but in determining such question of fact the intent of the owners of the dominant estate or the adverse acts of the servient estate acquiesced in by the owners of the dominant estate are the important and controlling considerations. (9 R. C. L. 812.) For the purposes of this case the lots owned by plaintiffs, that is the north lot and lot 3, are the dominant estates. The only one interested either directly or indirectly in the ownership of these lots that is shown to have had anything to do with the closing of the alleyway with a store structure was James R. Cardwell. It is not necessary to determine the extent of his authority to represent all parties interested in the lots for it may be conceded he had authority to act for all, yet there is nothing in his statements or conduct that proves an intent to permanently abandon the easement. He testified that he limited the period the alley was to be closed to the period within which the A. Starr Best Company was to erect a new building. Best and Lauren corroborated him in this particular

and there was no witness who contradicted them on this point. A part of the agreement between Best and Cardwell was that the rentals should be divided and this arrangement was fulfilled during Best's ownership of the lease. There is no evidence which tends to prove that Cardwell was accepting such rental in consideration of a permanent abandonment of the right. The store structure was to be temporary in duration and only covered the south 38 feet of the alleyway, leaving the north 10 feet of lot 1 and all of lot 2 unobstructed. Best testified the alleyway to the north of the enclosed part was used for the delivery of merchandise to his store on lots 1 and 2. Under the circumstances shown, the intention was that the obstructions in the alley should be of temporary character and did not destroy or work an extinguishment of the easement. The facts in *Chicago and Eastern Illinois Railroad Co.* v. *Clapp,* 201 Ill. 418, cited by defendants, are distinguishable from the facts in this case so that it is not controlling.

Defendants contend they had no knowledge of the agreement between Best and Cardwell and no notice that the interests of the dominant estate in lots 1 and 2 had not been fully waived. They refer to Cardwell's remodeling of the building during the period of his ownership of the Bodman-Best lease, its appearance thereafter, and the fact that he collected rentals for the enclosed space from Markie. It is not claimed that these facts form the basis of estoppel against plaintiffs.

On September 10, 1935, defendants Brooks *et al.*, trustees, made a contract with Bodman for the purchase of lots 1 and 2, subject to the Bodman-Best lease. Incorporated in the contract was the provision that the conveyance was to be made subject to an "easement over east ten feet of said premises for private alley." This contract was not recorded but defendants were parties to the contract and having contracted in reference to it are

not in position to say they had no notice of the continued existence of the easement. The Randolph street side of the enclosure was repaired so that the lines which marked the outer opening of the alley could not be seen, but that was not true of the north wall. The master found it was constructed against the wall of the building to the east, extended to the second floor ceiling with no "tie ins" between the walls of the building. This gave it the appearance of a structure inserted in the opening under the main building. Defendants' contention is without merit.

Under the views expressed, it is not necessary to consider plaintiffs' objection to that part of the decree which held that the north lot and lot 3 were servient to an alleyway for the use of the lots owned by defendants.

For the reasons assigned, the decree of the trial court is reversed and the cause remanded with directions to proceed in accordance with the views expressed.

*Reversed and remanded, with directions.*