# Illinois Official Reports

## Appellate Court

---

### *Oak Run Property Owners Ass'n v. Basta*, 2019 IL App (3d) 180687

---

| | |
|---|---|
| Appellate Court Caption | THE OAK RUN PROPERTY OWNERS ASSOCIATION, INC., an Illinois Not-for-Profit Corporation, Plaintiff and Counterdefendant-Appellee, v. RAY BASTA, KRIS BASTA, K.B. FARMS OF MONTANA, L.L.C., MICHAEL ZAGARDO, JANICE ZAGARDO, and THE SPOON VALLEY LAKE SANITARY DISTRICT, Defendants (Michael Zagardo and Janice Zagardo, Defendants, Counterplaintiffs, and Cross-Plaintiffs-Appellants; Ray Basta, Kris Basta, and K.B. Farms of Montana, L.L.C., Defendants and Cross-Defendants-Appellees; The Spoon Valley Lake Sanitary District, Defendant-Appellee). |
| District & No. | Third District No. 3-18-0687 |
| Filed | November 5, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Knox County, No. 15-MR-183; the Hon. Paul L. Mangieri, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Skinner, of Skinner & Associates, L.L.C., of Galesburg, for appellants. |
| | John W. Robertson, of Statham & Long, LLC, of Galesburg, for appellee Oak Run Property Owners Association, Inc. |

Daniel S. Alcorn and Elisa M. Nelson, of Alcorn Nelson LLC, of Galesburg, for appellees Ray Basta, Kris Basta, and K.B. Farms of Montana, L.L.C.

James D. Blake, of Blake Law Office, LLC, of Galesburg, for other appellee.

Panel          JUSTICE WRIGHT delivered the judgment of the court, with opinion.
Justices Holdridge and Lytton concurred in the judgment and opinion.


**OPINION**

¶ 1      The Oak Run Property Owners Association, Inc. (ORPOA), initiated a declaratory action against Ray and Kris Basta, The Spoon Valley Lake Sanitary District (Sanitary District), and Michael and Janice Zagardo to determine the rights, duties, and responsibilities of the parties in relation to a retaining wall built by the Bastas near their shared property line with the Zagardos. The Zagardos appeal the circuit court's findings relating to the declaratory action and the denial of their cross/counter-claims seeking injunctive relief.

¶ 2                                I. BACKGROUND

¶ 3      Defendants, the Bastas, and defendants-appellants, the Zagardos, own adjoining lots in the Forest Ridge Subdivision (Subdivision). On June 4, 2014, the Bastas applied for a permit to construct a residence on their lot No. 392.[1] Article VI, sections 1 and 2, of the Subdivision's covenants, provide the Architectural and Environmental Control Committees with the authority to approve construction plans in the Subdivision. In practice, these two committees operate as one, known as the AEC. The Bastas were approved for the June 4, 2014, permit.

¶ 4      On August 3, 2015, the Bastas applied for a second permit for purposes of landscaping and tree removal on lot No. 392. This permit application broadly sought approval for "retaining walls." The AEC approved this second permit at a meeting on August 5, 2015.

¶ 5      On September 17, 2015, the subcontractor for the Bastas, Scot Thompson, submitted drawings to the AEC's inspector, Daniel Russell, to append a retaining wall to the landscaping and tree removal permit approved by the AEC on August 5, 2015. The drawings indicated the retaining wall would, at least in part, be situated within one of the 10-foot utility easements that exist between the Subdivision's lots.[2]

¶ 6      On September 22, 2015, the Bastas applied for a third permit from the AEC to build a detached garage on lot No. 392. This third permit, approved by the AEC on October 7, 2015,

_____

[1]K.B. Farms of Montana, L.L.C. (K.B. Farms), was also named as a defendant in the circuit court. K.B. Farms owns lot No. 392. The Bastas own K.B. Farms.

[2]The utility easement allows defendant, the Sanitary District, to maintain the Subdivision's sanitary sewer system.

granted the Bastas permission to build a detached garage with "2x6 walls, concrete wall found[ation]."

¶ 7 On September 28, 2015, the Bastas' subcontractor, Chris Courtright, began constructing the retaining wall. The retaining wall was constructed, at least in part, within the 10-foot utility easement, approximately 2 feet from the property line with the Zagardos' lot No. 391 and 10 feet from the Zagardos' home.[3] Lot No. 391 is not the Zagardos' primary residence, so they did not observe the Bastas' retaining wall until mid-October 2015. By that time, the concrete for the retaining wall was poured and cured, and the forms on the retaining wall had been removed. However, the ground near the retaining wall was not yet backfilled or landscaped. Shortly after discovering the retaining wall, the Zagardos expressed their objections by lodging a complaint with the AEC.

¶ 8 On November 4, 2015, the AEC considered the Zargardos' objections to the retaining wall.[4] Further, in mid-November to early December 2015, the Zagardos e-mailed the manager of plaintiff-appellee, the ORPOA, met with the ORPOA board, and met with the AEC to request the removal of the retaining wall. No action was taken by these entities to remove the retaining wall.

¶ 9 However, on December 3, 2015, the ORPOA filed a complaint for declaratory judgment in the circuit court of Knox County under section 2-701 of the Code of Civil Procedure (Code) (735 ILCS 5/2-701 (West 2014)), seeking guidance on whether the construction of the retaining wall violated the Subdivision's covenants and/or the AEC's rules and regulations and, if so, whether any remedies existed after the retaining wall was completed.

¶ 10 The Zagardos answered the complaint for declaratory judgment and filed cross-claims and a counterclaim against the Bastas, the ORPOA, and the Sanitary District.[5] The Zagardos alleged sections 3 and 4 of article VII of the Subdivision's covenants forbid the construction of retaining walls in the 10-foot utility easements. The Zagardos also claimed the ORPOA, by allowing the Bastas to construct the retaining wall without accurately describing its scope and dimensions, violated the Subdivision's covenants and the AEC's rules and regulations. The

---

[3]Thompson was originally the subcontractor for the retaining wall on the Bastas' lot No. 392. However, as the project progressed to require concrete, Courtright took over the construction of the retaining wall. Thompson remained involved with landscaping.

[4]The approved minutes from the November 4, 2015, AEC meeting read as follows:

"Retaining Structure, Lot 392 FR: The details of the project and complaint were presented to the AEC Committee. The Committee members were in agreement that the structure on 392 FR complies with AEC Rules and Regulations. It was believed that the structure will address erosion and drainage concerns given the topography of the two lots, and must be finished with stone or painting and landscape plants, so that it will be in harmony with the other structures within the development."

At the bench trial, objections and arguments pertaining to the accuracy and approval of these minutes were heard by the circuit court. Ultimately, the circuit court found that, on November 18, 2015, the minutes were approved by a quorum of AEC members who attended the November 4, 2015, meeting. Thus, subject to further evidence, the circuit court found that, under section 1 of article VI, a quorum of "three (3) or more representatives" of the AEC approved minutes stating the retaining wall "complies with AEC Rules and Regulations."

[5]On May 30, 2018, the Zagardos' cross-claims against the Sanitary District were resolved by summary judgment. The Sanitary District remained a party only to the declaratory action.

Zagardos sought monetary damages and a permanent injunction for the removal of the retaining wall. The relevant sections of the Subdivision's covenants and the AEC's rules and regulations are recited below.

## A. The Bench Trial

A bench trial was held on June 1 and 6, 2018. Both parties presented multiple witnesses.

### 1. Ray Basta

Ray explained he acted as his own general contractor for the construction of the retaining wall. Ray relied upon his subcontractor, Thompson, to obtain AEC approval and permitting for the retaining wall. It was Ray's understanding that Thompson took all necessary steps to amend the landscaping and tree removal permit, approved on August 5, 2015, to include the retaining wall.

Ray knew the retaining wall was being constructed in a utility easement, and he did not request permission from the AEC or the Sanitary District to construct the retaining wall in that location. Ray knew he and his wife would be required to remove the retaining wall if the Sanitary District found that to be necessary for the sewer system maintenance.

According to Ray, the Bastas always intended to abate the visual impact of the retaining wall. He and his wife considered various landscaping options. Eventually, the Bastas landscaped the retaining wall with Boston ivy and sky pencil hollies that would grow in size to entirely cover the retaining wall. This plan was effectuated without access to the Zagardos' lot.

### 2. Janice Zagardo

In mid-October 2015, Janice first saw the retaining wall when she arrived at lot No. 391. She was immediately upset about the sight of the retaining wall, so she contacted the ORPOA to lodge a complaint and inquire about whether the retaining wall was approved by the AEC. Eventually, Janice spoke with AEC inspector Russell. In mid-October 2015, Russell viewed the retaining wall and informed Janice that it had been approved by the AEC on a landscaping permit. Russell also told Janice that the Bastas planned to landscape the retaining wall.

Janice testified that the retaining wall was only 10% complete in mid-October 2015, due to the lack of landscaping and unconstructed connection to the Bastas' detached garage. According to Janice, in spite of her objections, construction continued on the retaining wall after she met with Russell in mid-October 2015. She agreed in mid-October 2015, the retaining wall "was up *** and the concrete forms had been removed."

### 3. Daniel Russell

Russell testified that the retaining wall was not described in the Bastas' landscaping and tree removal permit approved by the AEC on August 5, 2015. However, in late-September 2015, after the landscaping and tree removal permit was issued, Thompson provided drawings of the retaining wall to be appended to that permit. The drawings did not indicate the scope or dimensions of, and no formal application was filed with the AEC for, the retaining wall.

After viewing the drawings, Russell, in his discretion as AEC inspector, approved the retaining wall and told Thompson he could begin construction. Russell assured Thompson that

he would do what was necessary to add the retaining wall to the existing landscaping and tree removal permit. Russell confirmed it is common practice and procedure for him to grant minor changes to construction plans without consulting the AEC. According to Russell, neither the Subdivision's covenants nor the AEC's rules and regulations restrict his authority to approve such changes. Russell did not believe he was required to consult the AEC before advising Thompson and the Bastas that they could construct the retaining wall.

¶ 23 Russell received a phone call from Janice about the retaining wall, causing him to travel to the Zagardos' lot. Russell was surprised by the height of the retaining wall. He told the circuit court that he felt the drawings provided by Thompson were misleading as to the elevation and topography of lot Nos. 391 and 392. In Russell's opinion, the retaining wall, as constructed, involved major changes to the landscaping and tree removal permit approved by the AEC on August 5, 2015. If Russell had been more informed of the scope and dimensions of the retaining wall, as constructed, he would have presented the drawings to the AEC.

¶ 24 **4. Scot Thompson**

¶ 25 Thompson said the retaining wall was not described in the landscaping and tree removal permit approved by the AEC on August 5, 2015, because the Bastas had not yet instructed him to build a retaining wall. On September 17, 2015, after the prospect of constructing a retaining wall arose, Thompson provided drawings of the retaining wall to Russell. The drawings did not indicate the height of the proposed retaining wall or that it would be situated within a utility easement. At this time, Thompson did not know the height of the retaining wall.

¶ 26 Upon leaving the drawings with Russell, Thompson believed he had done everything necessary to secure approval for the retaining wall. About 80 to 90% of Thompson's work is done in the Subdivision, so Thompson was aware that Russell could approve minor, but not major, changes to landscaping and construction plans on behalf of the AEC. Though the retaining wall was a major change, Thompson did not seek formal approval from the AEC.

¶ 27 **5. Chris Courtright**

¶ 28 Chris Courtright stated he was approached by the Bastas in September 2015 to construct the retaining wall. At that time, the Bastas were waiting for approval to construct the retaining wall. Eventually, the Bastas and Thompson informed Courtright the retaining wall was approved.

¶ 29 Courtright testified that, by mid-October 2015, the retaining wall was in place on the Bastas' lot. The connection to the Bastas' detached garage was the only portion that was not completed. The retaining wall is "pinned and epoxied" to the Bastas' home.

¶ 30 Courtright also testified about his invoice for the work done at the Bastas' lot, dated November 10, 2015. He confirmed the invoice included charges for both the Bastas' retaining wall and detached garage. In some areas the charges could not be distinguished.

¶ 31 **6. Michael Davison**

¶ 32 Davison is the general manager of the ORPOA. He confirmed that minor changes to landscaping and construction plans are frequently allowed by Russell without formal approval by the AEC. It is up to Russell to determine whether a change is minor or major in relation to

the landscaping or construction plans originally submitted to the AEC, and contractors rely on Russell to determine the substantiality of those changes.

¶ 33     Davison believed the construction of the retaining wall was a major change to the original landscaping and tree removal permit approved on August 5, 2015. Therefore, the retaining wall required a permit from the AEC and could not be approved by Russell. Davison was "[a] little shocked at the size" of the retaining wall and the fact that it was not approved by the AEC.

¶ 34     Davison did not believe Russell exceeded his authority as AEC inspector by approving the retaining wall. Rather, Russell, whether intentionally or unintentionally, was misled and "thought [the Bastas were] building a small retaining wall, which is common on most properties *** [and] would not have required a permit." If Russell approved the retaining wall as constructed by the Bastas, however, then he would have exceeded his authority. Davison agreed it is Russell's job to inquire about construction plans containing insufficient information.

¶ 35     Davison explained other retaining walls have been permitted and constructed in the Subdivision's utility easements. Davison clarified the ORPOA was not taking the position that a permit for this particular retaining wall would have been denied by the AEC. The AEC simply was not given the opportunity to consider a permit for the retaining wall. The retaining wall was substantially completed when Davison first saw it on November 12, 2015.

¶ 36                                    7. Lori Dagen

¶ 37     Dagen is a real estate appraiser who visited the Zagardos' lot No. 391 on October 19, 2017, to conduct a fair market value calculation. Dagen found the fair market value of the Zagardos' lot was $290,000. Dagen opined that the retaining wall was unattractive and could reduce the fair market value of the Zagardos' lot. However, if the Bastas followed a landscaping plan costing approximately $10,000, then any reduced fair market value to the Zagardos' lot would be cured.

¶ 38                                    8. Stephen Daly

¶ 39     Daly is the City of Galesburg township assessor and a certified general real estate appraiser. Daly conducted a historical valuation of the Zagardos' lot No. 391. Prior to the construction of the retaining wall, Daly valued the Zagardos' lot No. 391 at $373,000. After the construction of the retaining wall in mid-October 2015, Daly valued the Zagardos' lot No. 391 at $363,000. Like Dagen, Daly testified that the cost to cure any devaluation caused by the retaining wall was an estimated $10,000 in landscaping.

¶ 40                         B. Judgment of the Circuit Court

¶ 41     On July 13, 2018, the circuit court entered an order resolving the ORPOA's complaint for declaratory judgment and the Zagardos' cross-claims and counterclaim for damages and injunctive relief. Initially, the circuit court found the retaining wall, as constructed, was 10 to 11 feet in height, 10 inches thick, and reinforced with 2 "deadmen" and ¾ inch rebar. Next, the circuit court resolved the issues presented by the ORPOA in its complaint for declaratory judgment, finding:

> "I. Did [the] Bastas, or their designee, comply with the [ORPOA]'s AEC Rules in submitting the drawing for the retaining wall, on September 17, 2015?

- 6 -

Answer: No

II. Did Daniel Russell, the [ORPOA]'s employee, have authority to append that drawing to [the] previously approved [p]ermit *** without AEC *** review and approval?

Answer: No, not based upon the actual wall being considered by the Bastas.

III. Did [the] Bastas, or their designee, mislead or deceive Russell as to the scope and dimension of the proposed wall?

Answer: Though perhaps not intentionally, yes the Bastas, or their designees, mislead [*sic*] Russell as to the scope and dimension of the proposed wall.

IV. Does the wall, as constructed, conform to or exceed the scope of the drawing submitted on September 17, 2015?

Answer: The wall as constructed exceeded the scope of the drawing submitted on September 17, 2015.

V. As of the date of this suit, was the wall 'completed' within the meaning of Article VI, Section One of the [Subdivision's] Covenants?

Answer: Yes. Black's Law Dictionary (5th Ed. 1979) at p. 258, defines 'Completed' as 'Finished; nothing substantial remaining to be done; state of a thing that has been created, erected, constructed or done substantially according to contract.' The evidence of record is that the concrete retaining wall had been fully erected by mid-October, 2015, well before the suit was filed in December, 2015. While some backfilling and landscaping had yet to be performed, the concrete wall itself was poured and cured and the forms had been taken off.

VI. Does the construction of the wall within the utility easement constitute a 'building' in violation of Article VII, Sections Three or Four, of the [Subdivision's] Covenants?

Answer: Yes. The evidence of record was that the wall was attached to the Basta's [*sic*] house. In being so attached it became part of the building that is the Bastas' home.

VII. Does the AEC ***, under its rules and the covenants, have any authority to prevent construction of a non-building in a utility easement?

Answer: Yes. Article VI, Section 1, of the [Subdivision's] Covenants provides in pertinent part, that: 'No building, fence, *wall* or *other structure shall be commenced, erected or maintained* upon The Properties, nor shall any exterior addition to or change or alteration therein be made *until the plans and specifications* showing the nature, kind, shape, height, materials, and location of same shall *have been submitted to and approved in writing by the Board of Directors of the [ORPOA], or by architectural committee composed of three (3) or more representatives appointed by the Board.*'
***

[IX]. Do [the] Zagardos, as owners of [lot No.] 391, have an adequate remedy at law against [the] Bastas?

Answer: Yes, monetary damages for devaluation of the Zagardos' property.

[X]. Do [the] Zagardos, as owners of [lot No.] 391, have any remedy against the [ORPOA]?

Answer: No.

\*\*\*

[XII]. Should the court order removal of or alteration of the retaining wall on [lot No.] 392?

Answer: No. The Zagardos have failed to prove that they are entitled to injunctive relief and further the cost of repair or removal would be disproportionate to the value of the damage to the affected property.

[XIII]. What restrictions, if any, exist regarding the construction of retaining walls or other non-building structures in [the Subdivision] utility easements?

Answer: Article VI, Section I, of [the Subdivision's] Covenants provides in pertinent part, that: 'No building, fence, *wall* or *other structure shall be commenced, erected or maintained* upon The Properties, nor shall any exterior addition to or change or alteration therein be made *until the plans and specifications* showing the nature, kind, shape, height, materials, and location of same shall *have been submitted to and approved in writing by the Board of Directors of the [ORPOA], or by architectural committee composed of three (3) or more representatives appointed by the Board*.' " (Emphases in original.)

¶ 42 The circuit court also denied the Zagardos' counterclaim and cross-claim against the ORPOA and the Bastas. Regarding the claimed easement violations, the circuit court found "the evidence of record is that the easement is for the benefit of the utilities. The Sanitary District is \*\*\* the only utility joined in this case." Further, there were "numerous examples" of construction within the Subdivision's utility easements and the retaining wall at issue was "necessary and efficacious."[6]

¶ 43 Since the Zagardos "failed to demonstrate through their causes of action a clear and ascertainable right in need of protection," the circuit court denied the Zagardos' request for a permanent injunction to remove the retaining wall. The circuit court also stated "parenthetically" that, even if the Zagardos established a clear and ascertainable right in need of protection, they did not prove irreparable harm or inadequate remedies at law, which are prerequisites to any permanent injunction.

¶ 44 Specifically, the circuit court found the Zagardos had an adequate remedy at law. The evidence at the bench trial established that any reduction in the value of the Zagardos' lot No. 391 could be cured by a plan to landscape the retaining wall, costing approximately $10,000. "[B]y their actions and anticipated end results, the Bastas will have accomplished the only remedial relief that could have been possibly awarded."[7]

---

[6]The circuit court also rejected the Zagardos' claims that the retaining wall created a private nuisance and altered the surface drainage of lot Nos. 391 and 392. These findings are not challenged on appeal.

[7]On appeal, the Zagardos do not make arguments pertaining to damages or the adequacy of legal remedies.

¶ 45 On October 22, 2018, the circuit court denied the Zagardos' motion to reconsider. The Zagardos filed a timely notice of appeal on November 21, 2018.

¶ 46 II. ANALYSIS

¶ 47 On appeal, the Zagardos challenge both the circuit court's findings relating to the complaint for declaratory judgment and the circuit court's denial of their cross-claim and counterclaim for a permanent injunction requiring the removal of the retaining wall. We address the Zagardos' arguments arising from these differing causes of action in the separate sections below.

¶ 48 A. Declaratory Judgment

¶ 49 A declaratory action, as requested by the ORPOA, allows courts "to take hold of a controversy *** after the dispute has arisen, but before steps are taken which give rise to claims for damages or other relief." (Internal quotation marks omitted.) *Beahringer v. Page*, 204 Ill. 2d 363, 372-73 (2003); see 735 ILCS 5/2-701 (West 2014). The procedure is designed to "settle and fix rights before there has been an irrevocable change in the position of the parties that will jeopardize their respective claims of right." (Internal quotation marks omitted.) *Beahringer*, 204 Ill. 2d at 373. Declaratory actions do not create substantive rights or duties, but afford "a new, additional, and cumulative procedural method" to determine the parties' rights. *Id.*

¶ 50 The standard of review applied to a declaratory judgment depends upon the nature of the circuit court proceeding. *Pekin Insurance Co. v. Hallmark Homes, L.L.C.*, 392 Ill. App. 3d 589, 593 (2009). Legal determinations are subject to *de novo* review, while factual determinations are reviewed for an abuse of discretion. *Id.*; accord *In re Marriage of Rife*, 376 Ill. App. 3d 1050, 1060 (2007). Both standards of review are relevant to this appeal.

¶ 51 The Zagardos ask our court to reverse the circuit court's finding that the retaining wall was "completed" within the meaning of article VI, section 1, of the Subdivision's covenants, as of mid-October 2015. However, it is not clear what the Zagardos hope to gain with such a reversal. At oral argument, the Zagardos' counsel indicated the retaining wall was "probably" "completed" before December 3, 2015, when the ORPOA filed its complaint for declaratory judgment. Regardless, as discussed below, we affirm the circuit court's finding of "completion."

¶ 52 By way of review, the circuit court found in the declaratory action that the Bastas failed to "comply with the [ORPOA]'s AEC rules in submitting the drawing for the retaining wall *** on September 17, 2015." Article VI, section 1, of the Subdivision's covenants prohibits structures, including walls, from being "commenced, erected, or maintained" in the Subdivision before "the plans and specifications showing the nature, kind, shape, height, materials, and location of same" have been "submitted to and approved in writing by" the ORPOA or the AEC. However, the same covenant provides that "in any event, if no suit to enjoin the addition, alteration or charge has been commenced prior to the *completion* thereof, approval will not be required and this Article will be deemed to have been fully complied with." (Emphasis added.)

¶ 53 Unfortunately, neither article VI, section 1, nor any other covenant provides a definition for "completion." Thus, the circuit court adopted a definition of "completed" that is contained in the Black's Law Dictionary. See Black's Law Dictionary 258 (5th ed. 1979). Under this

- 9 -

definition, "completed" means "[f]inished; nothing substantial remaining to be done; state of a thing that has been created, erected, constructed or done substantially according to contract." *Id.*

¶ 54 On appeal, the Zagardos discuss definitions for "substantial completion" and "completed" that are found in the case law. For example, the Zagardos state that in *Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 666 (2007), work was found to be "completed" only when "a party has entirely fulfilled its contractual duties." Further, in *In re Liquidation of Lumbermens Mutual Casualty Co.*, 2018 IL App (1st) 171613, ¶ 28, "substantial completion," albeit under New Jersey law, meant the only remaining tasks were "punchlist," *i.e.*, "finishing, corrective[,] or remedial work."

¶ 55 The Zagardos argue under any one of the three above-discussed definitions, the circuit court erred by finding the retaining wall was "completed" in mid-October 2015. The Zagardos point out that, after mid-October 2015, additional concrete footings and walls, rebar, pea gravel, and dirt were used to connect the retaining wall to the Bastas' detached garage. Thus, the Zagardos contend the remaining work to the retaining wall was extensive, rather than "finishing or corrective," as of mid-October 2015. Further, the Zagardos focus on the Courtright Construction invoice to demonstrate that the subcontractor's contract was not fulfilled and the retaining wall was not "completed."

¶ 56 Here, the circuit court relied upon the meaning of "completed" found in the Black's Law Dictionary. See Black's Law Dictionary 258 (5th ed. 1979). Unlike the Zagardos, however, we view this definition of "completed" as consistent, rather than in conflict, with the definition for "substantial completion" found in *Liquidation of Lumbermens*, which was relied upon by the Zagardos. See *Liquidation of Lumbermens*, 2018 IL App (1st) 171613, ¶ 28. Under either definition, structures may be deemed "completed" or "substantially completed," respectively, if the remaining work is unsubstantial. See *id.*; see also Black's Law Dictionary 258 (5th ed. 1979). Thus, the circuit court did not abuse its discretion as a matter of law since the Black's Law Dictionary definition of "completed" finds support in the case law.

¶ 57 Now, we turn to the question of whether the circuit court's application of the facts to the Black's Law Dictionary definition of "completed" was an abuse of discretion. The circuit court found "the concrete retaining wall had been fully erected by mid-October, 2015." "[B]ackfilling and landscaping had yet to be performed, [but] the concrete wall itself was poured and cured and the forms had been taken off."

¶ 58 At the bench trial, an abundance of testimony supported the trial court's finding that the retaining wall was "completed" as of mid-October 2015. Russell and Courtright both testified that the retaining wall was substantially completed and in place on this date. Similarly, Janice Zagardo conceded that when she first saw the retaining wall in mid-October 2015, it "was up *** and the concrete forms had been removed." These facts are also supported by the photographs of record.

¶ 59 Further, the record demonstrates the Bastas' connection of the retaining wall to their detached garage was a separately permitted and AEC approved project. The September 22, 2015, permit for a detached garage, approved by the AEC on October 7, 2015, granted the Bastas permission for "2x6 walls, concrete wall found[ation]."

¶ 60 To summarize, these facts indicate, as of mid-October 2015, the backfilling, landscaping, and connection work that remained was either "unsubstantial," "punchlist," or part of an altogether separate AEC approved project. See Black's Law Dictionary 258 (5th ed. 1979);

- 10 -

*Liquidation of Lumbermens*, 2018 IL App (1st) 171613, ¶ 28. Thus, we agree that, for purposes of section 1 of article VI, the record supports the trial court's finding that the retaining wall was "completed" as of mid-October 2015. As a matter of fact, the circuit court did not abuse its discretion when making this finding.

¶ 61                             B. Permanent Injunction

¶ 62      Next, we address whether the Zagardos were entitled to a permanent injunction for the removal of the retaining wall. A permanent injunction is an extraordinary remedy. *Sadat v. American Motors Corp.*, 104 Ill. 2d 105, 115 (1984). A party must demonstrate (1) a clear and ascertainable right in need of protection, (2) irreparable harm in the absence of a permanent injunction, and (3) inadequate remedies at law. *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 44. Generally, a trial court considering injunctive relief also balances the equities. *County of Kendall v. Rosenwinkel*, 353 Ill. App. 3d 529, 539 (2004).

¶ 63      In most cases, a reviewing court will not overturn a trial court's order concerning a permanent injunction unless that order is against the manifest weight of the evidence. *Vaughn*, 2016 IL 119181, ¶ 22. However, if the grant or denial of the permanent injunction involved a question of law, then the standard of review is *de novo*. *Id.*

¶ 64      Here, the circuit court found the Zagardos "failed to demonstrate through their causes of action a clear and ascertainable right in need of protection." See *id.* ¶ 44. Thus, the circuit court commented only "parenthetically" as to the irreparable harm, adequacy of remedies, and balancing of the equities. See *id.*; *Rosenwinkel*, 353 Ill. App. 3d at 539.[8]

¶ 65      The Zagardos present two arguments for the reversal of the circuit court's finding that they lacked a "clear and ascertainable right in need of protection." See *Vaughn*, 2016 IL 119181, ¶ 44. First, the Zagardos argue, as property owners within the Subdivision, they have a right to enforce article VII, sections 3 and 4, of the Subdivision's covenants, pertaining to utility easements, against the Bastas. Second, even if the retaining wall was "completed" in mid-October 2015, the Bastas were required to obtain formal permitting and approval for the retaining wall under article VI, section 1, of the Subdivision's covenants. The Zagardos' first argument is meritorious. Thus, we do not consider the Zagardos' second argument.

¶ 66      The circuit court found that the retaining wall, undisputedly situated in the utility easement, violated sections 3 and 4 of article VII by virtue of being connected to the Bastas' home. However, the circuit court also found the utility easements in the Subdivision were for the benefit of utility companies rather than the Zagardos. Thus, the circuit court found the Zagardos had no "clear and ascertainable right in need of protection" related to the utility easement. See *id.* We review this question of law *de novo*. See *id.* ¶ 22.

¶ 67      Article VII, sections 3 and 4, of the Subdivision's covenants state:
          "Section 3. *** No building shall be located nearer than 10 feet of the property on which such building is to be placed to any sideline."

_____

[8]The circuit court clarified at the hearing on the Zagardos' motion to reconsider that "[t]he weighing of equities only comes into existence if the Zagardos establish that they are entitled to injunctive relief, and I find that they have not." This is important in order to clarify that, to the extent the circuit court balanced the equities in this case, balancing of the equities was not outcome determinative.

- 11 -

"Section 4. Easements are reserved along and within ten feet of rear, front and sidelines of all original lots in the subdivision for the construction and perpetual maintenance of conduits, poles, wires and fixtures for electric lights, telephones and other public and quasi-public utilities, sewers, and drainage and to trim any trees which at any time may interfere or threaten to interfere with the maintenance of such lines with right of ingress to and egress from and across said premises to employees of said utilities. Said easement to also extend along any owners side and rear property lines in cases of fractional lots."

¶ 68 Further, section 7 of article VII of the Subdivision's covenants states:

"Section 7. *** Any owner of real property in said plat of *** [the] Subdivision shall have the right to prosecute any proceedings at law or in equity against any person or persons violating or attempting to violate any covenant contained herein, either to prevent him or them from doing so or to recover damages or other dues for such violations."

¶ 69 Our supreme court has stated an easement must be founded upon a deed, other writing such as a covenant or agreement, or prescription presuming a previous grant. *Chicago Title & Trust Co. v. Wabash-Randolph Corp.*, 384 Ill. 78, 84 (1943). When easements are created by express terms, the parties' rights must be ascertained from the words of the grant. *Id.* at 85.

¶ 70 Here, the utility easement was founded upon article VII, sections 3 and 4, of the Subdivision's covenants. See *id.* at 84. Thus, the rights of the parties in this case must be ascertained from the words of article VII. See *id.* at 85. Section 7 of article VII, which is the same article that creates the utility easement, broadly provides "*[a]ny* owner of real property in *** [the] Subdivision shall have the right to prosecute *any* proceedings at law or in equity against *any* person or persons violating or attempting to violate *any* covenant contained herein, either to prevent him or them from doing so or to recover damages or other dues for such violations." (Emphases added.)

¶ 71 Based upon the language of section 7 of article VII, we conclude the Zagardos have a "clear and ascertainable right" to enforce or require the enforcement of sections 3 and 4 of article VII against the Bastas. See *id.*; *Vaughn*, 2016 IL 119181, ¶ 44. The circuit court's ruling to the contrary was erroneous as a matter of law.

¶ 72 However, we may affirm the circuit court's ruling on any basis in the record. *Bocock v. McGuire*, 2017 IL App (3d) 150860, ¶ 11. Consequently, our analysis does not end with the reversal of the circuit court's determination that the Zagardos lacked "a clear and ascertainable right" to enforce article VII, sections 3 and 4. See *Vaughn*, 2016 IL 119181, ¶ 44.

¶ 73 The circuit court found that, even if the Zagardos had a "clear and ascertainable right in need of protection" under the Subdivision's covenants and/or the AEC's rules and regulations, the Zagardos could not prove the other elements necessary for a permanent injunction, namely, inadequate remedies at law. See *id.* Rather, the appraisers at the bench trial agreed that the Bastas could cure any devaluation to the Zagardos' property by spending $10,000 to landscape the retaining wall. Ray Basta and Janice Zagardo's testimony and the photographs of record support the circuit court's finding that the Bastas' "actions and anticipated results" will accomplish such a landscaping plan. Thus, further relief is unnecessary. After carefully reviewing the record, we agree the Zagardos were provided an adequate remedy at law and were properly denied a permanent injunction for the removal of the retaining wall.

## III. CONCLUSION

¶ 75    The judgment of the circuit court of Knox County is affirmed.

¶ 76    Affirmed.